THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, *v.* JOLIET RAILWAY EQUIPMENT CO. *et al.*, Defendants-Appellants.

Third District    No. 81—352

Opinion filed July 8, 1982.—Rehearing denied September 3, 1982.

198

ALLOY, J., concurring in part and dissenting in part.

Gerald R. Kinney, Arthur T. Lennon, and Roger D. Rickmon, all of Murphy, Timm, Lennon, Spesia & Ayers, of Joliet, for appellants.

Tyrone C. Fahner, Attorney General, of Springfield (Judith S. Goodie, Assistant Attorney General, of counsel), for the People.

JUSTICE HEIPLE delivered the opinion of the court:

This is an appeal by a salvage company from an injunction issued against their various business operations. The Attorney General, on behalf of the State, filed a complaint against the defendants seeking injunctive relief and civil penalties for alleged violations of the Environmental Protection Act (Ill. Rev. Stat. 1979, ch. 111½, par. 1001 *et seq.*). The defendant, Joliet Railway Equipment Company (Joliet), operates a railroad car salvage business with a salvage yard near Rockdale in unincorporated Will County, Illinois, and a railway car storage area in nearby Crest Hill, Illinois. The defendants, Arthur Pielet, Robert Pielet, and James Pielet are officers and stockholders of Joliet. Defendant Wally Knippenberg was the Rockdale salvage yard manager for Joliet.

The occurrence which precipitated the State's complaint was a fire at the Rockdale salvage yard during the dismantling of two sulfur tank cars on April 12, 1979. The fire produced sulfur dioxide smoke which carried into the building of a nearby industry, the National Bottle Company. Several National Bottle employees became ill and required medical attention.

The heart of the defendants' business involves the dismantling of retired railroad tank cars, boxcars, and flat cars with acetylene or propane cutting torches. When in service, the tank cars carried a variety of chemicals.

In its complaint, the State alleged that the defendants' method of dismantling tank cars caused air pollution and open burning. The

State further alleged that the defendants' entire salvaging operation caused and allowed open burning over the preceding six years. Purportedly, open burning resulted from: the use of cutting torches near combustible materials, the improper storage and handling of combustible materials, and the absence of adequate fire protection facilities.

The Environmental Protection Act (the Act) provides in pertinent part:

"No person shall:

(a) Cause or threaten or allow the discharge or emission of any contaminant into the environment in any State so as to cause or tend to cause air pollution in Illinois, either alone or in combination with contaminants from other sources, or so as to violate regulations or standards adopted by the Board under this Act;

\* \* \*

(c) Cause or allow the open burning of refuse, conduct any salvage operation by open burning, or cause or allow the burning of any refuse in any chamber not specifically designed for the purpose and approved by the Agency pursuant to regulations adopted by the Board under this Act; except that the Board may adopt regulations permitting open burning of refuse in certain cases upon a finding that no harm will result from such burning, or that any alternative method of disposing of such refuse would create a safety hazard so extreme as to justify the pollution that would result from such burning." Ill. Rev. Stat. 1979, ch. 111½, par. 1009(a), (c).

Air pollution and open burning are defined in the Act as follows:

" 'Air Pollution' is the presence in the atmosphere of one or more contaminants in sufficient quantities and of such characteristics and duration as to be injurious to human, plant, or animal life, to health, or to property, or to unreasonably interfere with the enjoyment of life or property." Ill. Rev. Stat. 1979, ch. 111½, par. 1003(b).

" 'Open Burning' is the combustion of any matter in the open or in an open dump." Ill. Rev. Stat. 1979, ch. 111½, par. 1003(n).

A seven-day bench trial established that a fire occurred at the Rockdale salvage yard on April 12, 1979. Defendant Knippenberg, the yard manager, and Luis Magna, an employee, testified that the fire occurred during the process of dismantling a railroad tank car. Magna testified the fire was caused, in part, by the fact that a water hose which could have been used to supply water to the fire was con-

stricted by a tanker car which was laying upon it. Upon freeing the hose, the area was sprayed down and the previously visible smoke disappeared. The fire reignited that evening after the employees departed. The fire was finally extinguished by Magna and other employees.

Employees of National Bottle Company, a nearby factory, testified that they suffered dizziness, vomiting, nausea, headaches, and tearing of the eyes on the day the fire occurred. The State's medical expert, Dr. Meyer, testified such symptons were commonly associated with sulfur dioxide inhalation.

The State maintained that because of a unity of interest between various members of the Pielet family that each of them, individually, should be enjoined from carrying on the proscribed activities under any business name. To this end, the State introduced evidence to establish the ownership of Joliet in the following proportions:

| | |
|---|---|
| Pielet Bros. Scrap Iron and Metal, Inc. | 72% |
| Arthur Pielet | 18% |
| James Pielet | 5% |
| Robert Pielet | 5% |

Further testimony revealed that 92.5% of Pielet Bros. Scrap Iron and Metal, Inc., is owned by Arthur Pielet with the remaining portion owned by his children and grandchildren. Arthur, James and Robert Pielet are all officers of Joliet as well as Pielet Bros. Scrap Iron and Metal, Inc. Defendant Knippenberg was responsible for buying and selling railroad cars and for establishing the manner in which the cars are dismantled at the Rockdale yard facility for Joliet. Testimony indicated that outside of the Rockdale salvage yard, Joliet stored railroad cars at its siding in Crest Hill. Robert Pielet testified that Pielet Bros., Inc., operated a salvage yard at McCook but that no Joliet operations were performed there.

Evidence was adduced at trial about the general *modus operandi* of the salvage yard. The evidence indicated that when purchased, many of the tank cars still had chemical residues. These residues, when subjected to the heat from the cutting torches, produced fumes which were often toxic. In the incident that gave rise to this action, Joliet was cutting a tank car which contained sulfur residue.

In dismantling operations, Joliet cut sections of the tank, box and flat cars while wood was part of the car. When the cutting torch was applied to metal, sometimes the wood close to the metal would smolder. If the cutting torch was applied directly to the wood, burning or smoldering would result. Records of the Rockdale Fire Department introduced at trial tended to show that 45 fires occurred over a period

of seven years at a "railroad salvage yard, Mound Road." While Joliet's Rockdale salvage yard is bounded on the south by Mound Road, Joliet disputed their responsibility for some of those fires. Testimony indicated the entire region surrounding the salvage yard is heavily industrial. The evidence did not clearly establish defendants' responsibility for these 45 fires. The State also produced evidence that Joliet burned refuse wood in the open on several occasions. In addition, one of the defendants, Wally Knippenberg, told an EPA investigator that they prefer to burn the wood out of the railroad car undercarriages rather than remove it before cutting the metal as this is a more efficient and less costly method.

After the seven-day trial concluded, the trial court found that the defendants violated the open burning and air pollution prohibitions of the Act in their dismantling of railroad cars. The court found the April 12 incident caused air pollution within the meaning of the Act. Also, the trial court found the Rockdale yard's fire protection system inadequate. A $10,000 fine was imposed for violations of the Act and a permanent injunction was issued. The court enjoined the defendants from receiving tank cars which contain any chemical residue or combustible material anywhere in Illinois; prohibited them from dismantling any railroad cars with cutting torches anywhere in Illinois unless all combustible material has been removed; prohibited the defendants from causing or allowing open burning anywhere in Illinois; prohibited defendants from using cutting torches at Rockdale yard at any time when no water is available in the yard's water supply. Mandatory provisions of the injunction ordered the defendants to place all combustible materials removed from the salvaged railway cars at Rockdale yard in noncombustible containers and removed from the yard at least weekly; ordered that railway cars received by the defendants at the Rockdale yard be stored pending dismantling in a certain area designated by the trial court; ordered the defendants to install a proper fence around the liquid oxygen storage tank at the Rockdale yard; ordered the defendants to secure all liquid petroleum gas containers at Rockdale yard to stationary objects; ordered the defendants, within 30 days, to inventory and submit to the Illinois Environmental Protection Agency a list of all cars in their possession and state specifically the disposition to be made of each car; and ordered the defendants to install within six months a fire protection system according to elaborate specifications set forth by the trial court and within 30 days prior to the commencement of construction of the fire protection system to send to the State and the Rockdale Fire Department written plans describing the location and dimensions of the required water main, hy-

drant and roadway. The defendants appeal several findings of the trial court and provisions of the injunction as overbroad and not supported by the evidence.

We will not disturb the findings nor the injunctive scheme established by the trial court unless they are shown to be against the manifest weight of the evidence. The mandates of any injunctive action, however, must be a consequence of evidence received at trial. The present injunction goes far beyond the evidence of violations presented at trial. It is well settled that an injunction is never granted as a matter of right, but only in exigent circumstances and then only with judicial restraint and in due continence. (*Miollis v. Schneider* (1966), 77 Ill. App. 2d 420; 21A Ill. L. & Prac. *Injunctions* secs. 2 and 11 (1977).) Contrary to these accepted principles, the instant injunction is overbroad and excessive. We reverse and remand it. In so doing, we set forth each paragraph of the injunction for analysis.

Paragraph eight of the injunction provides:

"The defendants and each of them individually are permanently enjoined and prohibited from receiving railroad tank cars which contain any chemical residue or other combustible material, whether solid, liquid, or gas, at any location in the State of Illinois, particularly including the Rockdale Yard, the Crest Hill siding and property at Joliet Road and the Indiana Harbor Belt tracks in McCook, Illinois."

Paragraph nine of the injunction provides:

"The defendants and each of them are permanently enjoined and prohibited from dismantling with cutting torches at any location in the State of Illinois railroad cars of any type, until all combustible materials, particularly including chemical residues and woods, have been removed from said cars. The removal of any combustible materials from railroad cars by the defendants shall be in accordance with all applicable local and state laws."

Paragraph eight is unreasonable and unnecessary. Evidence tended to establish that air pollution occurred when unclean railroad cars containing chemical residue were subjected to a cutting torch before the chemicals were flushed from the cars. The trial court's order goes too far when it bars the defendants from receiving railroad cars containing chemical residue. After all, it is not the receiving of such cars that gives offense. It is the cutting them up before they are clean. The court's order is overly broad and unnecessary; it could have the effect of putting defendants out of business. A simple cleaning of the cars before cutting is all that is necessary to protect the environment. Thus, the measures prescribed by paragraph eight are

unwarranted by the evidence and must be stricken.

Paragraph nine prevents the defendants' use of a cutting torch on any railway car as long as it contains any combustible material such as wood. Wood, it should be understood, is a component part of most railway cars, even steel ones. The defendants' operation entails cutting up retired railway cars which have salvageable scrap steel or parts. A cutting torch is essential to such an enterprise. The application of a cutting torch to steel is not offensive to the Act. The application of a cutting torch to even combustible substances does not necessarily result in air pollution nor open burning. Moreover, the record is barren of evidence to support a finding that the burning of wood, with a cutting torch or otherwise, results in air pollution. And, combustion or smoldering of wood by itself is not violative of the open burning prohibition. The forbidden conduct is burning for the purpose of disposal of refuse. (*McIntyre v. Pollution Control Board* (1972), 8 Ill. App. 3d 1026.) Thus, paragraph nine is overbroad and excessive. It must be stricken as written.

■ Paragraph 10, along the same lines as the preceding paragraph, states:

> "The Defendants and each of them are permanently enjoined and prohibited from causing or allowing open burning at any location in Illinois where they engage in railroad salvage operations. For purposes of this Order, *open burning shall include*, without limitation, the *combustion of wood* or any other combustible material *which results from the use of a cutting torch*."
> (Emphasis added.)

Thus, the court attempts to legislate, without authority, that open burning occurs if combustion results from the use of a cutting torch. Such is a clear abuse of authority. Moreover, the trial court misunderstood and misapplied the statutory term "open burning" as set forth in the Act. The mere occurrence of an outdoor fire is not sufficient to constitute a statutory violation.

■ ■ The accidental or incidental starting of a fire within a railroad car being scrapped would not, in and of itself, constitute "open burning." Granted, it would be open burning if a railroad car were deliberately set on fire to burn out all of the wood before the steel was cut up. It would not be open burning if wood components in the car caught on fire during the use of a cutting torch by an operator who was disassembling a railroad car. In the latter instance, such a fire would be an accidental or incidental occurrence. Such fires should be extinguished by suitable techniques determined at the discretion of the salvager. But the control of such incidental fires does not require

the elimination of cutting torches. Cutting torches are an efficient and economically indispensible tool in this type of salvage operation. Judicial notice should be taken of their common usage and utility in industrial operations. Fire is a commonplace byproduct of nearly every aspect of American industry. If courts are going to engage in the business of outlawing any tool that could or might produce fire, then this economy is truly on the road back to the Stone Age.

This court in *McIntyre v. Pollution Control Board* (1972), 8 Ill. App. 3d 1026, made it clear that the Act is violated where open burning occurs for a specified purpose. The intent to institute open burning for the purpose of disposing of refuse must be shown before any statutory violation can be proved. The State failed to demonstrate solid evidence thereof for all the fires. The evidence merely reveals that there were several fires on property allegedly owned by the defendants. The mere occurrence of a fire or its frequency is insufficient to support a conclusion that the defendants engaged in open burning. *McIntyre v. Pollution Control Board.*

The State argues that in *Environmental Protection Agency v. Hulcher Emergency Service, Inc.* (1979), 33 Ill. P.C.B. Op. 391, the burning of wood during the cutting of boxcars with cutting torches was held to be open burning and violative of the Act. Our reading of the Board's order does not lead us to the same conclusion nor do we find that case completely applicable. First of all, in *Hulcher,* the complaint and order found air pollution violations as well as open burning. Moreover, the Board's order was entered upon a "Stipulation and Proposal for Settlement" between the parties. Therein, defendant Hulcher admitted to intentionally setting the wood railroad car liners on fire with torches before cutting up the steel portions. We note that the Pollution Control Board, even in light of such admitted intentional conduct, did not ban cutting torches, but merely required the wooden portions be removed initially.

In the instant case, the defendants dispute the allegations by the State that they intentionally set all the fires which are claimed as violations. While defendant Knippenberg admitted that sometimes the wooden undercarriages were intentionally burned out (and this, of course, would constitute open burning), the instant injunction goes far beyond proscribing such conduct. To deny defendants the use of the cutting torch in their operation while any combustible material remains in or on the railroad cars is unreasonable, unwarranted and excessive.

The evidence does not clearly establish that all the alleged fires occurred on the defendants' property. The Rockdale Fire Chief who

testified about such fires admitted he was unsure about the boundaries of the defendants' property. The State had to show the locus of the fires as well as a specific intent in setting them. The injunction is inconsistent with the quantity of the evidence on these two crucial issues.

Furthermore, the State's complaint alleged that such fires caused air pollution. Suitability or unsuitability of the pollution source is to be considered in view of the surrounding area. The defendants' salvage operation is in a highly industrialized area. No evidence was produced by the State to show that the combustion of wood was injurious to health or life.

■ Paragraphs eight, nine and 10 enjoin defendants' conduct throughout the entire State. The evidence demonstrates whatever violations occurred were in the Rockdale yard only. The scope of the injunction must be narrowly drawn to the location where the offensive conduct is established by the evidence. It cannot be expanded by speculation. We find no basis in the record for the scope of this injunction to extend to the entire State.

The next seven paragraphs of the injunction are mandatory in nature and set forth in exquisite detail measures designed to improve Joliet's fire safety facilities. We set them out in full:

"11. Effective immediately the defendants and each of them are prohibited from using cutting torches at the Rockdale Yard at any time when no water is available in the yard's water supply for any reason.

12. Effective immediately the defendants and each of them shall cause all combustible materials stripped from salvaged cars at the Rockdale Yard to be placed wholly within non-combustible containers upon removal from said cars, and stored thus until removal from the yard. Such combustible materials shall be removed from the yard no less frequently than once a week, and disposed of at a permitted landfill, or in some other lawful manner.

13. Effective immediately all railroad cars, and particularly the wooden box cars, received by the defendants in connection with the operation of the Rockdale Yard shall be stored pending dismantling within the area of the yard bounded by Mound Road, Larkin Avenue, the Rock Island main line, and the dirt road east of defendants' office trailer.

14. Effective immediately the defendants shall install and maintain a proper fence completely enclosing the liquid oxygen storage tank at the Rockdale Yard.

15. Effective immediately the defendants shall secure all liquid petroleum gas containers at the Rockdale Yard to stationary objects, whether in use or in storage, and shall maintain valve covers on all such containers when not in use.

16. Within 6 months after entry of this Order, the defendants shall install and maintain at the Rockdale Yard an adequate water supply including all of the following:

    A. An underground water main no less than 4 inches in diameter extending to the center of the yard, with a hydrant situated so as to make possible the delivery of water in standard sized fire hoses to all areas of the yard. The water main and hydrant shall comply with all applicable local, county and state requirements.

    B. Hoses and nozzles of standard size, equipped with National Standard Thread, of sufficient size and quantity to deliver water to all areas of the yard, in conformity with all applicable local, county and state requirements.

    C. A roadway of sufficient width and length, with grade crossings, to give fire fighting vehicles access to all areas of the yard, particularly including the northern portion thereof, with room to turn around at the end of said roadway.

17. Thirty days or more prior to the commencement of construction for items 16A and C above, the defendants shall file with the clerk of the court and submit to the plaintiff, and to the Rockdale Fire Department, written plans describing the location and dimensions of the required water main, hydrant, and roadway. Plaintiff may bring an appropriate motion before the court within 30 days after receipt of said plans, if it appears to the plaintiff that the plans do not comport with the terms of this Order."

■■ We note initially that injunctions which are mandatory in character are not favored by the courts. (*John Deere Co. v. Hinrichs* (1962), 36 Ill. App. 2d 255.) A mandatory injunction is not granted as a matter of right, but only in rare cases of great necessity when sound judicial discretion requires the court to act. (*National Bank v. River Forest State Bank* (1971), 3 Ill. App. 3d 209.) For the court to find such extreme urgency or great necessity, the need for such relief must be clearly established and free from doubt. (*Moehling v. N. & J. Enterprises, Ltd.* (1973), 15 Ill. App. 3d 987.) Our review of the record discloses that the only issues which are free from doubt are that

some fires occurred at the defendants' Rockdale salvage yard and they could not always be extinguished with the existing equipment.

■■ The detail and directives of the preceding seven paragraphs relating to fire prevention exceed the proper prerogative of the courts. Had the order required that an adequate fire prevention system be installed and maintained, such would be appropriate. The interest of the State in this controversy is that fires be controlled. The manner and method of control, so long as the fires are indeed controlled, is not the State's concern. The method is for the salvager to decide. The expertise of the judiciary is not in the engineering of fire protection systems. Nor do we have the wherewithal to supervise such projects. We note, however, that defendants have long since complied with the provisions of paragraphs 12, 14, 15, and 18. And, they agree with paragraphs 11 and 13.

Paragraph 18 of the injunction order states:

> "Within 30 days after entry of this Order, the defendants shall submit to the Illinois Environmental Protection Agency, Air Field Operations, 1701 South First Avenue, Maywood, Illinois 60153, a list of the last known location of each and every railroad car listed on Plaintiff's Exhibit 6 and Plaintiff's Exhibit 8, Invoice No. U-10300, giving the name and address of the person in possession of each car. For every such car which is now in the possession of the defendants, they shall state specifically what disposition is to be made of said car consistent with this Order."

Apparently this is directed at the fact that after the imposition of the preliminary injunction order, 47 uncleaned railway cars were received and stored at the Rockdale salvage yard. According to Invoice No. U-10300, dated October 4, 1979, 12 tank cars were purchased pursuant to an existing contract and shipped to the McCook storage yard owned by Pielet Bros. Scrap Iron, Inc. This contract did not provide for the cleaning of tank cars. Seven cars listed on Invoice No. U-10300 were sulfur cars. The defendants testified that these cars had been variously sold, dismantled or held in storage. While the defendants do not appeal from this provision and, in fact, have complied with it before issuance of the permanent injunction order, we believe it should be stricken. Paragraph 18 is designed to permit the Environmental Protection Agency to trace the cars and determine whether they have been disposed of properly. This type of monitoring is unnecessary and excessive. It bears no relation to any environmental protection goal. Assuming for the moment the preceding provisions of the injunction had been upheld, and they have not, paragraph 18 can

only be designed to harass. It is not within the scope of the State's complaint nor is it mandated by evidence or any principle of law we can discover.

For the reasons herein discussed, paragraphs eight through 18 of the trial court's order are reversed and remanded to the trial court for revision and modification in conformity with the views expressed in this opinion. Paragraph 19, which imposes a civil penalty of $10,000, is affirmed as supported by the evidence.

Affirmed in part, reversed in part and remanded.

STOUDER, J., concurs.

JUSTICE ALLOY, concurring in part and dissenting in part:

I agree with the majority that paragraph eight should be stricken and that the trial court's prohibition on the defendants from operating anywhere in Illinois is overbroad. Additionally, I agree that paragraph 16 of the injunction, concerning a fire prevention system, is overbroad. I disagree, however, with the majority's insistence upon wholesale reversal of the injunction, even on matters that are not properly before this court.

The majority's approach to paragraph 10 of the trial court order is contrary to the law and to the evidence in this case. Paragraph 10 prohibits the defendants from conducting or allowing any open burning within the State. An open burning occurs when a defendant engages in the burning for the purpose of disposing of refuse. (*McIntyre v. Pollution Control Board* (1972), 8 Ill. App. 3d 1026, 291 N.E.2d 253.) An accidental fire, therefore, is not an open burning in violation of the Environmental Protection Act. The majority specifically states that, "it would be open burning if a railroad car were deliberately set on fire to burn out all of the wood before the steel was cut up." As the majority recognizes, one of the defendants admitted that they *intentionally* burn the wood out of the undercarriages in order to dispose of this wood. The majority correctly cites *McIntyre* as the controlling law on this issue, correctly states the circumstances that would—under *McIntyre*—constitute a violation of the open burning statute and even cites the evidence in the record that plainly supports the trial court's decision. Inexplicably, however, the majority reverses this part of the injunction.

The majority attempts to justify this result by taking judicial notice of the utility and widespread use of cutting torches in American industry. As true as this may be, it is certainly irrelevant to the cor-

rect resolution of this case. The issues here are whether the defendants committed open burnings in violation of the law and whether the trial court can enjoin further open burnings in violation of the environmental protection laws. The record and the law supports the trial court's determination that unlawful open burnings occurred and that the defendants were responsible for those violations. Furthermore, there is no doubt that a court can enjoin further violations of the Environmental Protection Act. (*People v. Keeven* (1979), 68 Ill. App. 3d 91, 97.) Oddly enough, the majority even notes with apparent approval *Environmental Protection Agency v. Hulcher Emergency Service, Inc.* (1979), 33 Ill. P.C.B. Op. 391, in which the Pollution Control Board required the removal of the wood from the undercarriages before they were dismantled with cutting torches. In the case at bar, the net effect of paragraphs nine and 10 require the same precaution. Furthermore, the defendants themselves substantially agree with these restrictions: In their argument before this court, they suggest the injunction be modified to read that, "The Defendant shall be permanently enjoined from conducting any open burning to dispose of salvage material." Despite the evidence, the law and the defendants own request for relief, the majority completely reverses the trial court's correct determination on this point. Finally, even if we assume the trial court's language is in some sense vague or confused, it is far more prudent to use our well-established powers to modify the order to more clearly conform to the record and to *McIntyre* than to reverse the injunction completely.

Similarly, the majority's approach to paragraph 16, concerning prevention of fires on the defendant's property, is overbroad. The only paragraph that the defendants take issue with is paragraph 16. Paragraph 16, in essence, requires the defendants to build a water-based fire prevention system. I agree with the majority that the State's concern in this case is to prevent and control fires. I also agree that the trial court should not have mandated the detail of a water-based fire prevention system. The salvager should be free to use any adequate method of preventing and controlling fires. Again, however, the majority strikes the trial court order completely. This position is contrary to the evidence that demonstrates a consistent pattern of fires over many years. Additionally, the majority gives the defendants more relief than they requested. The defendants do no more than urge this court to modify the injunction to read: "No cutting torches can be used by Defendant until a fire prevention system of either the water or chemical type is installed and approved by the Environmental Protection Agency or other appropriate agency." Even the majority con-

cedes the trial court was correct at least insofar as its ruling that some fire prevention system is necessary, for they state that "[h]ad the order required that an adequate fire prevention system be installed and maintained, such would be appropriate." It is apparent, therefore, that the defendants agree they need a fire prevention system, the State agrees they need a fire prevention system, the trial court agrees with that conclusion, the majority agrees with that and I agree with that conclusion. There is no logical reason to strike the injunction completely. If the trial court's sole error was going into too much detail, we should simply modify the injunction to read, "The defendants shall install and maintain an adequate fire prevention and protection system, with the advice and approval of the Environmental Protection Agency. The defendants shall not use cutting torches until this system is installed and operative." Not only does this grant the defendants all the relief they asked for, but also tailors the injunction to the evidence as well.

Finally, I must take issue with the majority's complete reversal of parts of the injunction which are not at issue before this court. The defendants agree with the substance of paragraphs 11 and 13 of the trial court's order. They raised no objection and started to comply with paragraphs 12, 14, 15 and 18. Curiously, the majority chooses to reverse these provisions without argument from either party and without any detailed analysis even in its opinion. The fact that the defendants have complied with these paragraphs does not require them to be reversed now, for the injunction requires *continued* compliance as well as initial obedience. More importantly, this court should not rule on abstract questions of law. "Other than for jurisdictional reasons a reviewing court should not normally search the record for unargued and unbriefed reasons to reverse a trial court judgment." (*Saldana v. Wirtz Cartage Co.* (1978), 74 Ill. 2d 379, 385 N.E.2d 664.) We should not even consider, much less reverse, issues that no party raises or argues on appeal.

I would modify paragraphs 10 and 16 to clarify the language and to insure they conform to the law and the record. I would strike paragraph eight, as the majority does, and I would affirm the trial court on all other points.