THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CONRAIL CORPORATION *et al.*, Defendants-Appellants (C W I, Inc., Defendant).

Fifth District   No. 5—92—0539

Opinion filed May 12, 1993.

Wildman, Harrold, Allen & Dixon, of Chicago (James R. Morrin and Ruth E. VanDemark, of counsel), and Pepper, Hamilton & Scheetz, of Philadelphia, Pennsylvania (Laurence Z. Shiekman, Philip H. Lebowitz, and Philip L. Hinerman, of counsel), for appellant Conrail Corp.

Barbara Kay Parker and Joel A. Poole, both of Polsinelli, White, Vardeman & Shalton, of St. Louis, Missouri, and James C. Bowers, Jr., and Dennis J. Dobbels, both of Kansas City, Missouri, for appellant TENNSV, Inc.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Susan Frederick Rhodes, Assistant Attorney General, of Chicago, of counsel), for the People.

JUSTICE LEWIS delivered the opinion of the court:

This case involves an interlocutory appeal pursuant to Supreme Court Rule 307 (134 Ill. 2d R. 307) from orders denying motions to dissolve or vacate an *ex parte* temporary restraining order (TRO) and from the court's subsequent entry of a preliminary injunction against the defendants on July 14, 1992. Only defendants T E N N S V, Inc. (TENNSV), and Consolidated Rail Corporation (Conrail) appeal from the circuit court's orders. The other defendant, C W I, Inc., does not join in this appeal. The issues on appeal are: (1) whether the trial court erred in issuing the *ex parte* TRO; (2) whether the trial court erred in its construction of the Illinois Environmental Protection Act (Ill. Rev. Stat. 1991, ch. 111½, par. 1001 *et seq.*); (3) whether the trial court's actions are preempted by Federal law; and (4) whether the trial court's actions violate the commerce clause of the United States Constitution (U.S. Const., art. I, §8, cl. 3). For reasons more fully stated below, we affirm the trial court's orders.

On July 7, 1992, the People of the State of Illinois, through the offices of the State's Attorney of St. Clair County, Illinois, and the Illinois Attorney General, filed their complaint for injunctive and other relief against defendants to restrain defendants from allowing railcars of municipal solid waste (MSW) from New York to pollute an area in Fairmont City, Illinois. The complaint alleged that it was brought pursuant to sections 42 and 43(a) of the Illinois Environmental Protection Act (the Act) (Ill. Rev. Stat. 1991, ch. 111½, pars. 1042, 1043(a)). The complaint was filed at the request of the Illinois Environmental Protection Agency (Agency). Basically, the complaint alleged that the defendants had violated certain provisions of the Act by their transfer and storage of waste at the railyard (called Rose Lake), and that their failure to comply with the Act resulted in substantial danger to the environment or public health of the area.

On July 8, 1992, an *ex parte* hearing was conducted on the State's complaint. Attorneys for defendant TENNSV were present at the hearing but were not allowed to cross-examine the State's witnesses, although the court did conduct brief colloquys both before and after the witnesses' testimony, in which TENNSV was allowed to state its position as to the issues before the court.

Kenneth Mensing, the regional manager for the Bureau of Land Pollution Control for the Agency, testified that he had been to Rose Lake three times in the week of July 3, 1992. During those three visits, he observed approximately 50 containers of refuse on flatbed rail cars at that yard. The containers were metal rectangular boxes with

open tops covered with nylon mesh tarp. He described the containers as being in poor condition, and some of them were leaking and dripping a liquid onto the ground, with flies and maggots on and around the containers and a rotting, putrid odor in the proximity of the containers. According to Mensing, the leaking, or leachate, occurs when rainwater comes into contact with the refuse in the containers. The leachate contains bacteria and contaminants that could potentially wash into the groundwater. The flies and maggots are vectors for the spread of diseases.

Mensing briefly described the process that occurs with the refuse containers at Rose Lake: the railcars with the trash containers are brought into the yard; the containers remain on the flatbeds until a crane or some other machinery removes the trash container and places it onto a truck chassis for eventual hauling to a landfill. None of the defendants have permits for these activities from the Agency. In Mensing's opinion, the condition of the refuse containers, the leaking, the flies and maggots, and the transfer of the containers from railcar to truck chassis constitute a substantial threat to the environment or public health.

Scott Penny, the Fairmont City chief of police and administrative officer, testified that he had been at the Rose Lake yard that morning and had observed 104 full refuse containers and 11 empty containers. He described the containers as being damaged. At least one container's floor was defective, and refuse was falling through the bottom. Each container has a 1,133-cubic-foot capacity. They are covered with mesh to keep the refuse from spilling out, but the mesh allows rain to come into contact with the garbage. He observed trash protruding over the side walls of the containers and 18 to 24 inches above the containers. Every one of the containers he observed after the rainfall of the weekend of July 4, 1992, was leaking. The 15 containers that were brought to the yard the evening before the hearing were located 735 feet from his home and within 1,000 feet or less of other residences. The area surrounding the yard is primarily residential. Other residents in the area complain about the garbage at Rose Lake. Penny testified that the refuse containers are an offensive and filthy condition so near a residential area.

He described the transfer process between railcar and truck essentially the same as Mensing. Many of the containers he observed that week had been at the Conrail yard for three to four days. According to Penny, there was an incredible stench in the vicinity of the containers. Flies crawl all over the containers and all over the liquid that oozes out of the containers onto the truck chassis. He observed

some of the trucks leave with the refuse containers, and those containers were leaking a watery fluid out of the back as they were moved. He stated that his actions as police chief in impounding the vehicles with the trash would have been the same regardless of where the trash came from. A spokesperson for Conrail had told Penny that the trash shipments into the Rose Lake facility would continue indefinitely.

The court found, based upon the testimony, that there were numerous violations of the Act, in that defendants' operations were conducted without permits from the State of Illinois for the transfer or storage of MSW. The court found that under section 43(a) of the Act (Ill. Rev. Stat. 1991, ch. 111½, par. 1043(a)), "there is a substantial danger posed by the conduct of the defendants at the site to the environment and to the persons." The court found that the site is within 1000 feet of residential areas. On July 8, 1992, the court entered an *ex parte* temporary restraining order against defendants Conrail and TENNSV that ordered them to do the following:

"1. Begin immediately to remove any and all railcars containing MSW at the Conrail facility and transport said railcars to an appropriate transfer or disposal site; all railcars to be removed by rail by 11:00 p.m. 7/8/92.

2. Take steps necessary to immediately and properly dispose of the MSW and leachate that have been deposited upon the ground at the Conrail facility;

3. Provide the Illinois Environmental Protection Agency with written notice of removal and disposal activities described above, including the ultimate destination of the railcars and roll-off boxes; and

4. Refrain from transporting to the Conrail facility any additional railcars containing MSW."

A hearing "on the matter" was scheduled for July 14, 1992. Prior to entry of the written order but after the court verbally announced its decision to enter the TRO, the trial judge asked the attorney for TENNSV if he understood the order and he indicated that he did understand it. No one objected to the July 14, 1992, hearing date.

On July 13, 1992, TENNSV filed an answer and several affirmative defenses to the State's complaint. On July 14, 1992, the date of the hearing, TENNSV filed a written motion to dissolve the TRO, alleging that neither the complaint nor the order granting the TRO complied with mandatory requirements of the Illinois statute concerning the entry of TROs. (Ill. Rev. Stat. 1991, ch. 110, par. 11—101.) Also on July 14, 1992, Conrail filed a lengthy memorandum in opposi-

tion to the motion for preliminary injunction, arguing, *inter alia*, that the TRO violated the commerce clause of the United States Constitution. U.S. Const., art. I, §8, cl. 3.

At the hearing on July 14, 1992, the court initially announced that the hearing was pursuant to the July 8 TRO. The attorney for TENNSV orally moved for leave of the court to file its written motion to dissolve the TRO. Conrail orally moved in support of that motion, and the court granted Conrail leave to join in TENNSV's motion to dissolve. The court gave TENNSV the opportunity to proceed on the motion to dissolve the TRO, but the State requested additional time to file a written response to the motion, to which TENNSV objected, stating that they were entitled to proceed with the motion to dissolve the TRO, and that every day that went by with the TRO in effect added to the damage to TENNSV. The trial judge responded that he was satisfied that section 43(a) (Ill. Rev. Stat. 1991, ch. 111½, par. 1043(a)) was the only statute under which he proceeded on July 8, 1992, that no other statutory authority was needed, that he would give the State an additional week to respond, and that the TRO would remain in full force and effect until then. The State then requested leave of the court to proceed to an evidentiary hearing on its complaint for preliminary injunction, stating that the complaint was *not* relative to the section 43(a) proceeding of July 8, 1992. The court asked the attorney for TENNSV if he was ready to proceed on the State's complaint, and TENNSV did not object.

The first witness on July 14 was Kenneth Mensing, who testified basically the same as on July 8. He additionally stated that during the week of July 3, 1992, he observed missing or damaged floors on one or two of the refuse containers at Rose Lake. The leachate from the refuse containers can contain environmental contaminants, such as heavy metals, bacteria, and organic constituents. The Agency considers the defendants' actions of transferring the refuse containers from train to truck to constitute the operation of a transfer station, which, under the Act, is not allowed within 1,000 feet of a residence. (Ill. Rev. Stat. 1991, ch. 111½, par. 1022.14.) The Agency's policy is that the transportation of waste material is exempt from the permit process and allowed within 1,000 feet of residences if no storage and no physical transfer of the refuse occurs. Mensing testified that the Agency requires 24 hours to pass before the refuse is considered to be in temporary storage, and that as soon as refuse is transferred off a railcar, the area is considered a transfer station under the Act's definition. A permit must be obtained from the Agency to operate either a transfer station or a temporary storage facility.

Scott Penny testified essentially the same as he had on July 8. After Penny's testimony, the State rested its case. TENNSV moved to dismiss the State's complaint on the basis that the State had not proved a *prima facie* case of entitlement to a preliminary injunction, that the Agency's interpretation of the Act was clearly unconstitutional, and that the request for preliminary injunction was overly broad. Conrail joined in the motion to dismiss.

The trial judge denied the motion to dismiss, stating that, based upon the testimony presented, he was of the opinion that the State had presented a *prima facie* case for a preliminary injunction, that the court had reviewed the extensive memorandum filed by Conrail, that there were no Federal rules or regulations in the particular area to which the preliminary injunction was to apply, that the commerce clause did not preempt the court's proposed actions, and that the testimony of the two State witnesses established that the defendants' actions at Rose Lake constitute both storage and transfer as defined under the Act.

The defendants then presented their evidence. TENNSV called Cory Reeves, a certified fire investigator, who had been hired by TENNSV on July 8, 1992, to shoot a videotape of the Rose Lake facility. Through his testimony, the videotape was shown and described. In addition to testifying about the condition of the refuse containers and the lack of any leakage or smell around the containers, he testified that he did not notice an unusual number of flies around the containers.

The defendants presented only two other witnesses. TENNSV read from a transcript of the testimony of William Child, the chief of the Bureau of Land Pollution Control for the Agency, who had testified in a related case that the Agency's policy is that refuse must be at a location for 24 hours before the Agency considers it to be in temporary storage. Conrail called Robert David Hagerman, the terminal superintendent for the Rose Lake facility. He described the work done there and how the yard is used to switch train cars from one engine to another. Rose Lake is Conrail's westernmost yard, so trains arrive mainly from the east, and many are switched to other systems continuing to the west. The yard repairs cars under the supervision of Federal inspectors. If a car is carrying refuse and is found to be defective by the Federal inspectors, the car is repaired with the refuse in the car without touching the refuse. Many of Conrail's other railroad yards in Illinois are also located within 1,000 feet of residential areas.

After hearing the parties' arguments, the court found that the preliminary injunction requested by the State would not discriminate

against interstate commerce in violation of the commerce clause. The trial judge went on to state that he had reviewed the Act, and he found that the legislative intent behind the Act's definition of transfer station (Ill. Rev. Stat. 1991, ch. 111½, par. 1003.83) was to maintain the integrity of the environment and to protect the communities in the area where transfers of waste materials occur. The court found that section 3.83 (Ill. Rev. Stat. 1991, ch. 111½, par. 1003.83) provides that if waste is transferred from one rail carrier to another rail carrier, or from a rail carrier to a motor vehicle or water carrier, then the Act defines the area as a transfer station. If the area is defined as a transfer station, then a permit must be obtained from the Agency prior to operation. The court found that the environmental concern is specifically for the act of the transfer, "where the highest level of risk seems to be." The court found defendants to be in violation of section 3.83 (Ill. Rev. Stat. 1991, ch. 111½, par. 1003.83) because they operate a "transfer station" as defined by that statute but do not have a permit allowing them to do so.

The court entered a preliminary injunction but specifically allowed defendants to continue to switch trains and cars as needed, so long as the switching did not involve the actual, physical removal of the refuse containers from the rail carrier to any other carrier. The court incorporated its findings from the July 8, 1992, TRO hearing into the order granting the State's motion for preliminary injunction. The trial judge found that the Act authorized the State to request the preliminary injunction independent of the Code of Civil Procedure's requirements for obtaining injunctive relief. (Ill. Rev. Stat. 1991, ch. 110, par. 11—101.) Finally, the trial judge found that the motion to dissolve the TRO was moot, as the objections were based upon the requirements of section 11—101, which he found to be inapplicable to the State's action. The trial judge further found, in effect, that the TRO was moot due to the entry of the preliminary injunction, the terms of which superseded the TRO.

On July 23, 1992, TENNSV filed a motion to vacate the *ex parte* TRO issued on July 8, 1992, contending, for the first time, that the court had failed to comply with the mandatory requirement that a hearing on whether the TRO was entered wrongfully be conducted within three working days of issuance of an *ex parte* TRO. The motion contended that the court had never conducted such a hearing but had entered the preliminary injunction on July 14, 1992, without first considering if the TRO had been wrongly entered, in violation of section 43(a) of the Act (Ill. Rev. Stat. 1991, ch. 111½, par. 1043(a)). The motion further alleged that the court's procedure violated TENNSV's

rights of due process and that the terms of the TRO were overly broad.

After a hearing on August 6, 1992, the court entered an order denying defendants' motion to vacate the TRO, finding, again, that section 11—101 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 11—101) does not apply to the procedures under section 43(a) of the Act and that defendants had been afforded "a hearing" on July 14, 1992, as required by section 43(a) (Ill. Rev. Stat. 1991, ch. 111½, par. 1043(a)). Defendant TENNSV appeals from the court's denial of both its motion to dissolve and the later motion to vacate, as well as from the entry of the preliminary injunction. Defendant Conrail appeals only from the denial of the motion to dissolve (filed by TENNSV on July 14, 1992) and from the entry of the preliminary injunction.

■ The defendants raise several issues on appeal, but we first deal with the State's argument that both TENNSV and Conrail have filed briefs in this court which include statements of fact that do not conform to the requirements of Supreme Court Rule 341(e)(6) (134 Ill. 2d R. 341(e)(6)). We agree with the State that both defendants' statements of fact include arguments, matters outside the record on appeal, and matters that were never put into evidence below. In deciding how to rule on this case, as well as in our recitation of the facts, we have disregarded all matters not before the trial judge in making his decision, and we grant the State's request to strike those portions of both defendants' briefs that do not conform to Rule 341(e)(6) (134 Ill. 2d R. 341(e)(6)).

Defendants initially raise numerous arguments surrounding the denial of their motions to vacate or dissolve the TRO. For the purpose of clarification, we feel compelled to point out initially that we could choose not to reach any of the defendants' arguments regarding the TRO for the reason that the trial court's order of July 14, 1992, effectively dissolved the TRO. On July 14, 1992, the defendants had already complied with the July 8 TRO, which ordered defendants to remove the railcars containing MSW from Rose Lake by 11 p.m. that night, required defendants to dispose of any MSW and leachate deposited onto the ground, required them to notify the Agency that they had complied with the TRO, and ordered them to refrain from transporting any more railcars containing MSW to Rose Lake in the future.

The preliminary injunction entered on July 14, 1992, had different and more limited terms. It did not prohibit defendants from bringing railcars loaded with garbage into Rose Lake in the future; it merely

ordered defendants to refrain from conducting a waste-storage or waste-transfer station at Rose Lake and, more specifically, required defendants to refrain from transferring waste from rail carrier to motor vehicle or water carrier or rail carrier, if the waste is actually removed from the rail car as a part of the transfer. Therefore, the TRO was no longer in effect and was not an order with which defendants had to comply, immediately upon entry of the July 14 preliminary injunction.

■ Although the court entered a preliminary injunction on July 14 and ruled that defendants' motions to dissolve were moot as a result thereof, we must discuss the issue of whether the trial court wrongfully entered the TRO, because defendants seek damages for the wrongful issuance of the TRO. There are three basic aspects to the issue of whether the TRO was entered incorrectly. First, we must decide if the evidence presented on July 8, 1992, gave the trial court a sufficient basis from which to find that defendants' activities presented a substantial danger to the environment or health of the persons in the area of Rose Lake, since that is the essential requirement for obtaining a TRO under section 43(a). Ill. Rev. Stat. 1991, ch. 111½, par. 1043(a).

The paramount issue before a court of review when considering the grant or denial of any interlocutory order, such as the court's July 8, 1992, TRO, is whether the trial court abused its broad discretionary power by entering the TRO. (*Stoller v. Village of Northbrook* (1987), 162 Ill. App. 3d 1001, 516 N.E.2d 355.) The statute under which the trial court was acting in entering the TRO provides as follows:

> "In circumstances of substantial danger to the environment or to the public health of persons *** [the State] may institute a civil action for an immediate injunction to halt any *** activity causing or contributing to the danger or to require such other action as may be deemed necessary. The court may issue an ex parte order and shall schedule a hearing on the matter not later than 3 working days from the date of the injunction." Ill. Rev. Stat. 1991, ch. 111½, par. 1043(a).

We find, from the evidence presented at the July 8, 1992, hearing, that the trial court had a sufficient basis from which to enter the TRO. For brevity's sake, we will not reiterate all of the evidence upon which we rely, except to say that the evidence regarding the leachate of water that had come into contact with the garbage and the presence of disease-spreading flies and maggots is an adequate and substantial danger to persons living within 1,000 feet of the yard. The

State was not required to show that the danger was currently harming the environment or risking people's lives or health but only that a reasonable potential for such harm existed as a result of defendant's actions. (*County of Will ex rel. Masters v. Waste Management of Illinois, Inc.* (1989), 182 Ill. App. 3d 436, 443, 538 N.E.2d 219, 224.) The evidence was at least adequate to show such a reasonable potential for danger to support the issuance of the TRO.

■ The next issue raised by defendants regarding the correctness of the TRO is whether the trial court erred by not complying with the requirements of section 11—101 of the Code of Civil Procedure (Ill. Rev. Stat. 1991, ch. 110, par. 11—101). Defendants are correct that section 11—101 was not adhered to, but we agree with the trial judge that section 11—101 does not apply to injunctive actions under the Act. In *People v. Van Tran Electric Corp.* (1987), 152 Ill. App. 3d 175, 503 N.E.2d 1179, this court determined that "[a]n action for injunctive relief by the State *** pursuant to section 42(e) of the Act is not governed by general equitable principles." (*Van Tran Electric*, 152 Ill. App. 3d at 184, 503 N.E.2d at 1185, construing Ill. Rev. Stat. 1991, ch. 111½, par. 1042(e).) Additionally, "[w]hen *a statute* authorizes such an action [the State] need only allege and show that there has been a violation of the statute by the defendants ***; there is no necessity to prove irreparable damage" or any other requirement imposed by the Code of Civil Procedure. (Emphasis added.) *People v. Keeven* (1979), 68 Ill. App. 3d 91, 97, 385 N.E.2d 804, 808.

There is no logical reason why the rule for section 42(e) should not apply to actions for injunctive relief under section 43(a). (Ill. Rev. Stat. 1991, ch. 111½, par. 1043(a).) Moreover, neither defendant submits any reason or authority to support the argument that the requirements of the Code of Civil Procedure must apply, other than the fact that section 11—101 of the Code exists. Clearly, "section 43(a) by its own terms concerns immediate injunctions on *ex parte* proceedings in circumstances of substantial danger to the environment or the health or welfare of persons." (*Van Tran Electric*, 152 Ill. App. 3d at 185, 503 N.E.2d at 1186.) We have already held that the court had enough evidence to establish the "substantial danger" necessary to meet the requirements of section 43(a) (Ill. Rev. Stat. 1991, ch. 111½, par. 1043(a)). The court adhered to the procedural and legal standards of section 43(a) and was not required to comply with the standards of the Code of Civil Procedure.

■ The final aspect of the issue of the correctness of the TRO is TENNSV's argument that the procedures employed by the court did not comport with the requirements of section 43(a) itself because

defendants were not afforded a hearing on the matter within three working days after the issuance of the TRO. This is the issue raised by TENNSV's July 23, 1992, motion to vacate the TRO. TENNSV correctly points out that four working days, rather than three, passed before the hearing was conducted. Additionally, the court ruled at the beginning of the July 14 hearing that only the issue of whether the State was entitled to a preliminary injunction was to be heard. However, we find that TENNSV has waived this argument by not objecting to the July 14 setting at the July 8 TRO hearing.

TENNSV lawyers were present at the July 8 hearing, and although they were not allowed to cross-examine witnesses, they were questioned by the trial court both before and after the hearing. TENNSV does not argue that they were prohibited by the court from objecting to the July 14 setting date. They did not object and, consequently, have waived any argument that the three-day hearing requirement was not met. As to Conrail, it does not argue that the hearing of July 14 was procedurally or otherwise incorrect. Besides, Conrail was present on July 14 and did not make any objection to the setting date at that time. Finally, and most importantly, however, is that the court did comply with the requirement to provide "a hearing on the matter," so that defendants' rights were not compromised by the court's procedure. The fact that the hearing on the matter was continued did not injure defendants as the relief that they requested on July 14 was obtained indirectly with the issuance of the preliminary injunction which nullified the TRO.

For all of these reasons, we hold that the trial judge did not abuse his discretion by finding on July 14, 1992, that the motion to dissolve the TRO was moot and should be denied. Furthermore, he did not abuse his discretion by denying the motion to vacate filed by TENNSV on July 23, 1992.

The next issue is whether the trial court erred in its construction of the Act. The trial court found that defendants' activities fell within the ambit of the Act's definitions of "transfer station" and "storage site," and that the defendants did not have the requisite permits for those activities. Defendants argue that their activities are not covered by any of the definitions of the Act. We disagree with the defendants and agree with the trial court's construction of the Act as applied to defendants' activities. The pertinent sections of the Act are as follows:

> " 'Transfer station' means a site or facility that accepts waste for temporary storage or consolidation and further transfer to a waste disposal, treatment or storage facility. 'Transfer

station' includes a site where waste is transferred from (1) a rail carrier to a motor vehicle or water carrier; *** [or] (4) a rail carrier to a rail carrier, if the waste is removed from a rail car ***." Ill. Rev. Stat. 1991, ch. 111½, par. 1003.83.

" 'Storage site' is a site at which waste is stored. 'Storage site' includes transfer stations." Ill. Rev. Stat. 1991, ch. 111½, par. 1003.47.

" 'Storage' means the containment of waste, either on a temporary basis or for a period of years, in such a manner as not to constitute disposal." Ill. Rev. Stat. 1991, ch. 111½, par. 1003.46.

■ The parties agree that if defendants' activities can properly be classified as temporary storage or the operation of a transfer station, then the Act prohibits defendants' activities at Rose Lake because the facility is within 1,000 feet of residences. It is undisputed that the defendants do not have any permit or variance from the Agency. The evidence at both the TRO and preliminary injunction hearings showed that waste was being transferred from rail carriers to trucks, and that sometimes the waste was left at Rose Lake for several days before shipment to a landfill site. We hold that the clear words of the Act defining transfer station, storage, and storage site apply to defendants' activities at Rose Lake. Therefore, the trial judge was not in error in finding that the Act applies to defendants and that they are in violation of the Act.

■ Although it does not change our holding, we note that the preliminary injunction finds that defendants have violated section 21(a) of the Act by allowing open dumping of waste to occur. (Ill. Rev. Stat. 1991, 111½, par. 1021(a).) We do not agree. Under section 3.24, open dumping is defined as "the consolidation of refuse from one or more sources at a disposal site that does not fulfill the requirements of a sanitary landfill." (Ill. Rev. Stat. 1991, ch. 111½, par. 1003.24.) We do not find any evidence in the record to indicate that defendants have consolidated refuse from one or more sources, nor is there any evidence in the record as to whether or not the site fulfills the requirements of a sanitary landfill. Therefore, we do not find any violation of the open-dumping provision of the Act. However, the finding as to section 21(a) in the written order of July 14, 1992, was not made by the trial court in its ruling from the bench that day and made no difference to the court's ruling on the preliminary injunction.

■ TENNSV additionally argues that if the Act applies, then the terms of the preliminary injunction are overly broad. In support of this argument, TENNSV cites *People v. Joliet Ry. Equipment Co.*

(1982), 108 Ill. App. 3d 197, 438 N.E.2d 1205, wherein the appellate court held that an injunction was overly broad and excessive. However, the facts of *Joliet Railway* are distinguishable from the case at bar. In *Joliet Railway*, the trial court had entered an injunction that applied to enjoin the defendant from conducting certain of its business activities throughout the State of Illinois. The appellate court held, *inter alia*, that there was no evidence to establish that the harm from the defendant's activities extended to the entire State, and as a result, the injunction was overly broad. Additionally, the appellate court held that the defendant had presented evidence to establish that less onerous methods of alleviating the pollution problems were available, and therefore, the injunction was excessive. *Joliet Railway*, 108 Ill. App. 3d at 203-04, 438 N.E.2d at 1212.

There are two main reasons why the facts of *Joliet Railway* are inapplicable to this case. First, the terms of the injunction issued in *Joliet Railway* are in no way similar to the terms of the injunction issued in this case. Second, and most importantly, the defendant in *Joliet Railway* had introduced a substantial amount of evidence that provided the court with information upon which to base a less onerous and more restricted injunction than the one that was entered. (*People v. Joliet Ry. Equipment Co.* (1982), 108 Ill. App. 3d 197, 438 N.E.2d 1205.) Here, no evidence was presented to the trial court from which it could have entered a less restrictive order. In closing argument on July 14, 1992, Conrail argued that it would accept an injunction that required only that the refuse containers not leak. However, such a limited injunction would not address the trial court's concern that the transfer of the waste containers off the railcars poses the greatest potential for environmental damage and danger to the residents living in close proximity to the railyard. Given the evidence presented, we hold that the terms of the preliminary injunction are not overly broad, and the trial court did not abuse its discretion in entering the preliminary injunction against defendants.

The third argument defendants raise is that the trial court's action in this case is preempted by the Interstate Commerce Act (Commerce Act) (49 U.S.C.A. §10101 *et seq.* (West Supp. 1992)). The defendants contend that the Commerce Act, in general, is a Federal regulatory scheme which gives the Interstate Commerce Commission (ICC) exclusive jurisdiction over interstate rail transportation in the United States, including intermodal activities, such as the operations at Rose Lake. The defendants' argument on this issue fails for two reasons.

■ First, the defendants cite section 10501(d) of the Commerce Act (49 U.S.C.A. §10501(d) (West Supp. 1992)) in support of their argument. However, that section of the Commerce Act does not prohibit the actions of the trial court in entering the preliminary injunction in this case; it merely provides that *to the extent of the jurisdiction conferred by the Commerce Act,* the ICC and State authorities have exclusive jurisdiction with respect to transportation by rail carriers. (49 U.S.C.A. §10501(d) (West Supp. 1992).) Furthermore, the Commerce Act, in section 10501(c) (49 U.S.C.A. §10501(c) (West Supp. 1992)), specifically states: "This subtitle does not affect the power of a State, in exercising its police power, to require reasonable intrastate transportation by [rail] carriers," unless the Commerce Act specifically regulates the particular subject or the State's regulation is inconsistent with the Commerce Act or other Federal law. No provision of the Commerce Act exclusively grants jurisdiction over the transportation of waste from inception to ultimate disposal. Thus, under the Commerce Act, the trial court's order is not preempted since it does not conflict with any provision of the Commerce Act or other Federal law. Defendants do not cite any other statutory authority for their proposition that the Commerce Act preempts the trial court's order in this case. Therefore, since defendants do not tell us where in the Commerce Act transfers of refuse containers from rail carriers are regulated, we cannot find any preemption.

Defendants' preemption argument also fails under the case law construing the Commerce Act. As Justice Thurgood Marshall wrote in *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.* (1981), 450 U.S. 311, 67 L. Ed. 2d 258, 101 S. Ct. 1124:

"Pre-emption of state law by federal statute or regulation is not favored 'in the absence of persuasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.' [Citations.] The underlying rationale of the pre-emption doctrine, as stated more than a century and a half ago, is that the Supremacy Clause invalidates state laws that 'interfere with or are contrary to, the laws of congress ....' [*Gibbons v. Ogden* (1824), 22 U.S. (9 Wheat.) 1, 211, 6 L. Ed. 23, 73-74.] The doctrine does not and could not in our federal system withdraw from the States either the 'power to regulate where the activity regulated [is] a merely peripheral concern' of federal law, [citation], or the authority to legislate when Congress could have regulated 'a distinctive part of a subject which is peculiarly adapted to local regulation, ... but did not,' [citation]. But

when Congress has chosen to legislate pursuant to its constitutional powers, then a court must find local law pre-empted by federal regulation whenever the 'challenged state statute "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." ' [Citations.]" *Kalo Brick*, 450 U.S. at 317, 67 L. Ed. 2d at 264-65, 101 S. Ct. at 1130.

Therefore, since defendants do not direct us to any particular Federal law that regulates the subject matter to which the preliminary injunction applies, the pertinent question is whether the preliminary injunction interferes with any Federal law. We find no Federal law with which the preliminary injunction in this case interferes. Although defendants cite numerous United States Supreme Court cases in support of their preemption argument, we will not enumerate those cases here, since none of those cases deal with the subject matter to which the preliminary injunction applies in this case. Moreover, the cases cited by defendants on this point find preemption because a particular Federal enactment conflicts with the contested State action in each case. Such a conflict does not exist in the case *sub judice* because there is no Federal law on the subject of an intrastate transfer of refuse containers. Rather, the subject matter of the preliminary injunction is of a merely peripheral concern to interstate commerce and is peculiarly adapted to local regulation.

Finally, the trial court was explicit in limiting the preliminary injunction so as not to interfere with defendants' interstate transportation. The defendants are free to continue to transport waste through the Rose Lake railyard. They are free to stop at Rose Lake to couple and uncouple railcars to make up new trains in order to transport their commodities, be it waste or some other commodity, to other destinations. And defendants are free to seek a variance from the Agency for the operation of a transfer station at the Fairmont City facility. Therefore, the preliminary injunction entered by the trial court does not interfere with the flow of interstate commerce.

The last argument raised by the defendants is that the preliminary injunction violates the commerce clause of the United States Constitution. (U.S. Const., art. I, §8, cl. 3.) The State counters that this argument is not justiciable within this interlocutory appeal because, while the trial court has verbally ruled from the bench that the injunction is not unconstitutional, the case remains pending in the trial court. The State contends that if we rule on the constitutional issue, we decide the merits of the case, which is not the function of an interlocutory appeal. We agree that the purpose of an interlocutory appeal is *not* to decide the

merits of the case below. (*Cameron v. Bartels* (1991), 214 Ill. App. 3d 69, 573 N.E.2d 273.) However, we do not believe that we can avoid ruling on the commerce clause issue raised by defendants, since the issue was extensively briefed and argued below and ruled upon, at least marginally, by the trial court. Of course, as the case proceeds in the trial court, new evidence or arguments or authority may be presented that change the court's ruling or the status of the issues presented in later appeals, but we find no basis upon which to waive the defendants' commerce clause arguments on review.

The commerce clause provides that Congress shall have the power to regulate commerce between the States. (U.S. Const., art. I, §8, cl. 3.) A whole line of United States Supreme Court cases establishes that a State cannot advance its own commercial interests by restricting commerce into or out of the State, "while [the Court] generally support[s] their right to impose even burdensome regulations in the interest of local health and safety." (*H.P. Hood & Sons, Inc. v. Du Mond* (1949), 336 U.S. 525, 535, 93 L. Ed. 865, 873, 69 S. Ct. 657, 663.) Solid waste, such as that shipped by defendants and subject to the preliminary injunction, is an article of commerce. (*City of Philadelphia v. New Jersey* (1978), 437 U.S. 617, 57 L. Ed. 2d 475, 98 S. Ct. 2531.) The crucial inquiry in cases such as this is to determine whether the State's regulation, here the preliminary injunction, is "basically a protectionist measure, or whether it can fairly be viewed as a law directed to legitimate local concerns, with effects upon interstate commerce that are only incidental." *City of Philadelphia v. New Jersey*, 437 U.S. at 624, 57 L. Ed. 2d at 482, 98 S. Ct. at 2536.

Subjects of potential Federal regulation, but which are local in character and which have not been passed upon at the Federal level, " 'are open to control by the States so long as they act within the restraints imposed by the Commerce Clause itself.' " (*Government Suppliers Consolidating Services, Inc. v. Bayh* (7th Cir. 1992), 975 F.2d 1267, 1276, quoting *City of Philadelphia v. New Jersey*, 437 U.S. at 623-24, 57 L. Ed. 2d at 481, 98 S. Ct. at 2535-36.) Under this analysis, the court must first decide if the statute is facially discriminatory against interstate commerce. If so, then the regulation must fall unless the discrimination is demonstrably justified by a valid factor unrelated to economic protectionism. (*Government Suppliers*, 975 F.2d at 1277.) Defendants contend that the Illinois Environmental Protection Act, as interpreted by the trial court and applied to defendants, is facially discriminatory, an argument with which we disagree but to which we will respond next. If the regulation is facially neutral, then the court must first consider its practical effect on both the local and interstate activity. If the effect on inter-

state commerce is merely incidental and the State's action regulates evenhandedly, then the regulation should be upheld unless it is established that the burden imposed upon interstate commerce is clearly excessive in relation to the putative local benefit. *Government Suppliers*, 975 F.2d at 1277.

Defendants urge us to find the Act, and therefore the injunction, facially discriminatory under the rule of *Ft. Gratiot Sanitary Landfill, Inc. v. Michigan Department of Natural Resources* (1992), 504 U.S. 353, 119 L. Ed. 2d 139, 112 S. Ct. 2019. However, we do not find that case applicable to the facts of the case at bar. *Ft. Gratiot* deals with a statutory scheme requiring that waste generated outside a county could not be accepted by a landfill without the prior authorization from that county. The Supreme Court found the statutory scheme there to be unambiguously discriminatory against interstate commerce. (*Ft. Gratiot*, 504 U.S. at 366, 119 L. Ed. 2d at 151, 112 S. Ct. at 2027.) The Supreme Court specifically stated in *Ft. Gratiot*, however, that "no claim [has been made] that petitioner's operation violated any health, safety or sanitation requirement" (*Ft. Gratiot*, 504 U.S. at 358, 119 L. Ed. 2d at 146, 112 S. Ct. at 2023), and that its determination "would be different if the imported waste raised health or other concerns." *Ft. Gratiot*, 504 U.S. at 367, 119 L. Ed. 2d at 152, 112 S. Ct. at 2027.

■ Because we do not find *Ft. Gratiot* applicable to this case, we do not reach defendants' arguments that the Act's definitions and regulations of regional pollution-control centers are facially discriminatory against interstate commerce. Suffice it to say that, since the rule of *Ft. Gratiot* does not apply to this case, defendants' arguments regarding the unconstitutionality of the statutory language concerning regional pollution-control centers is irrelevant to the issues before this court at this time. Within the framework of the relevant case law, we find that the injunction entered by the trial court has no aspect of local protectionism, and that it can and should be viewed as a regulation directed to the legitimate local concern of environmental damage and the health and safety of the people living in close proximity to the Fairmont City railyard.

For all of the reasons stated herein, we hold that the trial court's denial of the motions to dissolve and vacate the TRO and the entry of the preliminary injunction were not an abuse of discretion.

Affirmed.

GOLDENHERSH and MAAG, JJ., concur.