THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. CON-
RAIL CORPORATION, Defendant (OCON, Defendant-Appellant).

Fourth District   No. 4—92—1015

Argued June 17, 1993.—Opinion filed September 16, 1993.—
Rehearing denied November 15, 1993.

STEIGMANN, P.J., specially concurring.

Barbara K. Parker and Joel A. Poole, both of Polsinelli, White, Vardeman & Shalton, of St. Louis, Missouri, and James C. Bowers, Jr. (argued), and Dennis J. Dobbels, both of Polsinelli, White, Vardeman & Shalton, of Kansas City, Missouri, for appellant.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Susan Frederick Rhodes, Assistant Attorney General (argued), of Chicago, of counsel), for the People.

JUSTICE McCULLOUGH delivered the opinion of the court:

Defendant OCON, an Oklahoma joint venture engaged in the business of transporting nonhazardous municipal solid waste (MSW), brings this interlocutory appeal pursuant to Supreme Court Rules 307(a)(1) and 307(b) (134 Ill. 2d Rules 307(a)(1), (b)). OCON appeals the denial of its motions to dissolve and to vacate the *ex parte* temporary restraining order (TRO) issued on July 15, 1992. Section 43(a) of the Environmental Protection Act (Act) (Ill. Rev. Stat. 1991, ch. 111½, par. 1043(a)) provides for entry of an *ex parte* order. Such an order is not a temporary restraining order as used in the traditional sense and the trial court's designation as such was technically incorrect. Because the parties use this term, it will be used in this opinion. OCON has raised questions regarding the interpretation of certain sections of the Act (Ill. Rev. Stat. 1991, ch. 111½, par. 1001 *et seq.*) and the Code of Civil Procedure (Code) (Ill. Rev. Stat. 1991, ch. 110, par. 1—101 *et seq.*). We affirm.

On July 15, 1992, the State filed a complaint for injunctive and other relief against Consolidated Rail Corporation (Conrail) (which has not participated in this appeal) and OCON. The complaint was

brought on the joint motion of the Attorney General and State's Attorney at the request of the Illinois Environmental Protection Agency (IEPA) and pursuant to section 43(a) of the Act, which states:

"In circumstances of substantial danger to the environment or to the public health of persons or to the welfare of persons where such danger is to the livelihood of such persons, the State's Attorney or Attorney General, upon request of the Agency or on his motion, may institute a civil action for an immediate injunction to halt any discharge or other activity causing or contributing to the danger or to require such other action as may be necessary. The court may issue an *ex parte* order and shall schedule a hearing on the matter not later than 3 working days from the date of injunction." (Ill. Rev. Stat. 1991, ch. 111½, par. 1043(a).)

The complaint alleged that at least since July 13, 1992, there were approximately 41 railcars containing MSW, owned by OCON, located at a railway spur in Livingston County (the site) which was owned by Conrail. The complaint further alleged that on July 14, 1992, a representative of the IEPA inspected the railcars and found a large population of flies and other vectors around the railcars, a discernible odor emanating from the railcars and at least 20 cars leaking or dripping leachate. It was alleged neither OCON nor Conrail had applied for nor been issued any permits from the IEPA for the storage of the MSW at the site.

The complaint next alleged that by causing or allowing the storage of the railcars at the site, the presence of the vectors and the presence of the leachate, OCON and Conrail had created a substantial danger to the environment and to the public health and welfare of persons living and working near the site. The State asked the court to issue an *ex parte* immediate injunction order directing OCON and Conrail to:

"(1) Immediately begin to remove any and all railcars containing MSW at the site and transport said railcars to a properly permitted disposal or transfer site;

(2) Take steps necessary to immediately and properly dispose of the MSW and leachate that have been deposited upon the ground;

(3) Provide the Illinois Environmental Protection Agency with written notice of removal and disposal activities described above, including the ultimate destination of the railcars; and

(4) Refrain from transporting to the unpermitted site in Livingston County any additional railcars containing MSW."

The State also asked for a hearing on the matter within three working days of the issuance of the *ex parte* TRO and after that hearing, for the court to issue a preliminary injunction directing OCON and Conrail to:

"(1) Take all steps necessary such that no railcars containing MSW are stored at this or any other site in the State of Illinois without proper permits issued by the Illinois Environmental Protection Agency; and

(2) Take all steps necessary such that no MSW is transferred from railcars to over-the-road carriers at the site without proper permits issued by the Illinois Environmental Protection Agency."

The complaint was signed by the Attorney General, the State's Attorney for Livingston County and an assistant Attorney General from the Environmental Control Division. The complaint was dated July 12, 1992.

On July 15, 1992, the circuit court issued an "*ex parte* temporary restraining order," after hearing arguments from the State and finding that the complaint and memorandum demonstrated the existence of a substantial danger to the environment and the public health and welfare. The court ordered OCON and Conrail to perform the four things listed in the complaint. A hearing "on the matter" was scheduled for July 17, 1992. The order was signed, dated, and the time of 11:08 a.m. was noted. Although the State knew the identity of counsel for OCON and Conrail, as they had been in court the previous day in St. Clair County on a similar matter, neither OCON nor Conrail was present at this hearing. No record of this hearing was made.

A hearing was held on July 17, 1992, and counsel for the State and OCON were present. The parties indicated to the court that Conrail had agreed to keep the TRO in effect against it pending further negotiations between it and the State. On this date, OCON filed an answer and a motion to dissolve the TRO. The motion to dissolve alleged the TRO was invalid because (1) the State's complaint did not comply with section 11−101 of the Code (Ill. Rev. Stat. 1991, ch. 110, par. 11−101), (2) the TRO did not comply with the requirements of section 11−101 of the Code, and (3) the mandatory nature of the TRO denied OCON due process. Included in OCON's answer was a request for damages for the wrongful issuance of the TRO.

Initially, the court attempted to determine the purpose of the hearing. The State explained to the court that there were essentially two matters pending before it that could result in the same decision. First, there was a hearing "on the matter" pursuant to section 43(a)

of the Act, and second, there was a hearing in regard to OCON's motion to dissolve which implicated section 11–101 of the Code. The State suggested the court first have the hearing pursuant to section 43(a) of the Act and then proceed with OCON's motion to dissolve. OCON took great exception to that suggestion and argued that the purpose of the hearing was to determine whether the TRO had been properly issued.

The court stated it believed the hearing before it was pursuant to section 43(a) of the Act. The court then struck paragraph one of the TRO, finding it had become moot since the railcars had been moved. The court further indicated it would hear evidence as to whether it would be appropriate to continue paragraph 2 of the TRO as to the steps necessary to properly dispose of the MSW and leachate that had been deposited on the ground.

Testimony was presented to the court. Connie Keelin, the administrator of the Livingston County Health Department, inspected the site on July 14, 1992, at 6:30 p.m. She indicated the train was approximately one mile in length and she counted well over 20 railcars containing dumpsters full of garbage. She stated it was sprinkling at that time and all the cars she saw had a colored, slightly odorous liquid dropping from them. She found the dumpsters had office and household waste, including office paper and food substances. She saw flies around the railcars but detected no odor from the MSW itself. Keelin did not take any samples of the leachate and she estimated it was dropping out at a rate of one-half cup per hour. She characterized the leachate as smelling like old household garbage. It was her opinion that the leachate could be a public health hazard if it was left to continue.

On cross-examination, Keelin testified she did not believe the odor constituted a substantial danger to the public health or welfare. She could not tell whether the leachate constituted a substantial danger to the environment or public health because it was not tested. She could not quantify how many flies she observed at the site. She admitted the only house in the area of the site was at least 1,200 feet away and she did not believe the flies were a substantial danger to the people living in that house. She also admitted there were no drinking water streams near the site. On redirect examination, she explained that flies carry disease and have a range that would exceed 1,200 feet.

Richard A. Gerard, of the IEPA, inspected the site both while the train was there and after it had been removed. He testified there were a total of 49 railcars, 41 of which had containers of MSW. There were 114 such containers, 29 of which were leaking into the rock road

bed of the railroad track. He admitted he did not test the leachate to determine its contents.

He inspected the site on July 16, 1992, after the train had left. The only residue MSW was one eight-ounce milk carton that appeared to have mold growing on it. He did observe other waste materials not attributable to the train. Gerard did not see any residue from the leachate that had dripped from the train. He saw no need for any cleanup or remedial activity at the site and felt there was no imminent threat to any landowners from the brief presence of the train.

At this point, OCON attempted to begin its cross-examination of Gerard when the court interrupted and inquired as to whether the State had any further witnesses. The State indicated it did not and did not wish to have paragraph two of the TRO continued. The court agreed, finding there was no basis to continue paragraph two of the TRO and dissolved that paragraph. The court also struck the remaining paragraphs three and four of the order. OCON asked the court to find there was no basis for the allegations in the complaint. The court refused to make such a finding and based its ruling on the fact that there was no longer a need to continue the TRO. OCON asked to question the witnesses but the court refused as there would be no point to the questioning since the State wanted the TRO dissolved. The court ordered the TRO dissolved and found no further activity was contemplated but did rule on OCON's motion to dissolve the order.

On August 3, 1992, OCON filed a "motion to vacate the *ex parte* temporary restraining order entered pursuant to section 1043(a) [*sic*]." It alleged the court failed to comply with section 43(a) of the Act by not having a hearing within three days on the issue of whether the TRO had been properly issued. OCON also raised a due process argument and alleged the TRO was overly broad. It asked the court to enter an order dissolving and/or vacating the TRO and to set a hearing for damages sustained by improvidently granting the TRO. No action was taken on this motion within seven days whereupon, on August 10, 1992, OCON filed a notice of interlocutory appeal pursuant to Supreme Court Rule 307(b) (134 Ill. 2d R. 307(b)) from the circuit court's "failure and refusal to dissolve and/or to vacate the *ex parte* Temporary Restraining Order entered on July 15, 1992."

The State filed a motion to dismiss the interlocutory appeal.

This court granted the State's motion and dismissed OCON's interlocutory appeal on September 1, 1992. (*People v. Conrail Corp.* (4th Dist. 1992), No. 4—92—0668 (order of dismissal).) On October 13,

1992, OCON mailed to all parties a notice of hearing on its motion to vacate, scheduled for November 9, 1992.

At the hearing on that date, the court first noted to OCON that the TRO had been dissolved on July 17, 1992, and inquired as to what else it desired in its motion to vacate. OCON recited the procedural history of the case and then explained it sought a ruling that the TRO was wrongfully issued on July 15, 1992. The State's position was that the matter was moot because the TRO had been complied with, the necessity for continuing the TRO was not present, and section 43(a) of the Act had been complied with.

OCON then voiced its objection to the State's contention that the matter was moot. OCON noted section 11—110 of the Code (Ill. Rev. Stat. 1991, ch. 110, par. 11—110), which provides that after a TRO or preliminary injunction has been dissolved, the enjoined party can seek damages for the wrongfully issued TRO or preliminary injunction. OCON asserted this involved a two-step procedure wherein the court first determines whether the TRO or preliminary injunction was wrongfully issued, and if so, then holds a hearing on damages. The court noted that section 11—110 of the Code calls for a petition to be filed setting forth the nature and amount of damages claimed. The court noted there was no such petition on file. OCON insisted it was entitled to a hearing on whether the TRO entered on July 15 was properly issued before it had to file a petition regarding the amount of damages sought. The State indicated it would waive the requirement of filing the petition and allow the court to make a ruling on whether the TRO was properly issued.

The court first ruled that section 11—101 of the Code did not apply to the proceedings on July 15, 1992, because of the specialized nature of section 43(a) of the Act.

On November 18, 1992, the written order on OCON's August 3, 1992, motion to vacate and its July 17, 1992, motion to dissolve was entered. The court made the following findings:

"1. For the purposes of the Court ruling upon the above-referenced motions, the plaintiff has waived any necessity of a petition filed pursuant to paragraph 11—110 of the Code of Civil Procedure.

2. That the provisions of Section 11—101 of the Code of Civil Procedure do not apply to an *ex parte* temporary restraining order issued pursuant to 1043(a) of Chapter 111½.

3. That the Court's hearing of July 17, 1992, complied with the requirements of 1043(a) of Chapter 111½ that the court

hold a hearing within three days of the issuance of an *ex parte* restraining order issued pursuant to that section.

4. That a finding that circumstances of 'substantial danger' exist as required by 1043(a) of Chapter 111½ may be made upon the unverified representations of a State's Attorney or Attorney General.

5. That the court's procedure in issuing the *ex parte* order of July 15, 1992, did not violate the Fifth or Fourteenth Amendments of the United States Constitution or Article I, Section 2 of the Illinois Constitution.

6. That the court's order of July 15, 1992, was not overly broad and did not go beyond the authority of this court to issue an *ex parte* restraining order pursuant to Chapter 111½, 1043(a)."

The trial court's order denied the motion to dissolve the TRO and the motion to vacate the TRO.

The State first contends the issues raised in this appeal are moot. Generally, the State argues that OCON wants the TRO issued on July 15, 1992, dissolved but since the trial court already dissolved the TRO on July 17, the issues presented here are moot. The State suggests that reversal of the November 18, 1992, order would have no result because the TRO was dissolved on July 17, 1992, thereby rendering OCON's claims moot as of that date.

OCON responds that the issues presented by this appeal are not moot. First, OCON alleges it preserved the issues by filing its motion to dissolve on July 17, and attempting to have a hearing that day on that motion. OCON further contends there remains an actual controversy between the parties as to whether it is entitled to damages as a result of the improperly granted TRO, assuming that the TRO was in fact improperly granted.

■ A case becomes moot when, pending the decision on appeal, events occur which render it impossible for the reviewing court to grant effectual relief to any of the parties. (*Bluthardt v. Breslin* (1979), 74 Ill. 2d 246, 250, 384 N.E.2d 1309, 1311.) An injunction that has expired can no longer be dissolved because the court cannot dissolve that which no longer exists. (*Emerson Electric Co. v. Sherman* (1986), 150 Ill. App. 3d 832, 836, 502 N.E.2d 414, 417.) This conclusion, however, does not mean that damages under section 11—110 of the Code are never available in those cases where the preliminary injunction expires by its own terms before a reviewing court can consider whether it was improperly issued.

In *Bettendorf-Stanford Bakery Equipment Co. v. U A W Local Union No. 1906* (1977), 49 Ill. App. 3d 20, 363 N.E.2d 867, in rejecting the plaintiff's argument that the appeal dealt with a moot question because the restraining order had expired and no effectual relief could be granted, the court stated:

"By timely moving to vacate the TRO and then perfecting their appeal, defendants preserved for review the question whether or not the TRO was wrongfully issued. The question of damages, if any, does not come into issue until and unless an adjudication is made that the issuance was wrongful." *Bettendorf-Stanford*, 49 Ill. App. 3d at 22, 363 N.E.2d at 869.

In this case, OCON had filed a motion to dissolve the TRO. The trial court's docket order of July 17, 1992, does not make any ruling upon OCON's motion. OCON then filed a motion to vacate and appealed the July 17, 1992, order, which was dismissed by this court on September 1, 1992.

The issues presented by this appeal are not moot.

As to the merits of this appeal, OCON first alleges the trial court erred in concluding that the provisions of section 11—101 of the Code did not apply to a TRO issued pursuant to section 43(a) of the Act. OCON contends that since section 43(a) merely provides that the State can seek an "immediate injunction" but fails to explain the specific procedures for obtaining such relief, the procedures of section 11—101 of the Code must apply.

Section 11—101 of the Code states in pertinent part:

"No temporary restraining order shall be granted without notice to the adverse party unless it clearly appears from specific facts shown by affidavit or by the verified complaint that immediate and irreparable injury, loss, or damage will result to the applicant before notice can be served and a hearing had thereon. Every temporary restraining order granted without notice shall be indorsed with the date and hour of signing; shall define the injury and state why it is irreparable and why the order was granted without notice; and shall expire by its terms within such time after the signing of the order, not to exceed 10 days ***." Ill. Rev. Stat. 1991, ch. 110, par. 11—101.

In this case, the TRO was issued after an *ex parte* hearing and was based on the representations of the State. No transcript of this proceeding was made. The complaint seeking the TRO did not comply with section 11—101 of the Code because it was neither verified nor supported by affidavit. OCON notes that the TRO did not comply with section 11—101 of the Code because it did not (1) define

the injury, (2) state why the injury was irreparable or substantial, (3) state why it was granted without notice, or (4) contain a self-executing expiration date.

This exact issue was raised in the fifth district case of *People v. Conrail Corp.* (1993), 245 Ill. App. 3d 167, 613 N.E.2d 784, which involves the same parties and subject matter as the present case. In that case, a TRO was issued on July 8, 1992, ordering defendants to move the railcars that contained MSW and were leaking leachate. A hearing "on the matter" was held on July 14, 1992. On that date, the trial court heard evidence and then found that the State had presented a *prima facie* case for a preliminary injunction. The fifth district agreed with the trial court's conclusion that the requirements of section 11—101 of the Code do not apply to injunctive actions under the Act. This is the same conclusion reached by the trial court in this matter.

As in that case, OCON has offered no reason or authority to support its position that the requirements of section 11—101 of the Code apply to injunctive actions under section 43(a) of the Act except for the fact that section 11—101 of the Code exists. The trial court adhered to the procedural legal standards of section 43(a) of the Act and was not required to comply with the requirements of section 11—101 of the Code.

Next, OCON argues the trial court failed to comply with the requirements of section 43(a) of the Act. OCON contends (1) the TRO cannot be based on unverified representations by the State; (2) the hearing on July 17, 1992, should have been on whether the TRO had wrongfully been issued; and (3) the TRO issued on July 15, 1992, was overly broad and beyond the scope of the court's authority to issue such orders.

■ OCON's first argument is basically a restatement of its previous contention that the requirements of section 11—101 of the Code, namely the requirement that a complaint for a TRO be verified or accompanied by an affidavit, apply to TROs issued under section 43(a) of the Act. As we have resolved that issue in the preceding paragraphs, we will not discuss it again here.

OCON contends its due process rights were violated because the TRO was issued without notice, thereby causing it to incur "hundreds of thousands of dollars damage" by moving the railcars.

Generally, notice and a hearing prior to any governmental action is a constitutional prerequisite. In extraordinary or emergency situations, however, due process will be satisfied by a post-deprivation hearing. The protection of the public health and safety is a paramount

governmental interest which justifies summary administrative action. Where the public health is threatened, an administrative agency may act first and litigate later. (*City of Quincy v. Carlson* (1987), 163 Ill. App. 3d 1049, 1054, 517 N.E.2d 33, 36.) The potential release of hazardous waste into the environment is the very type of extraordinary or emergency situation which justifies a post-deprivation hearing. There is a strong public interest in protecting the public health and environment. Accordingly, statutes which were enacted for the protection and the preservation of public health are to be given extremely liberal construction for the accomplishment and maximization of their beneficial objectives. Consequently, the lack of a preenforcement hearing does not offend due process principles. *City of Quincy*, 163 Ill. App. 3d at 1054, 517 N.E.2d at 36.

Because of the involvement of these same parties in other similar actions, the trial court should have given serious consideration to requiring notice. However, the extraordinary and emergency situation presented here, due to the threat of the public health and safety and the safety of the environment, establishes that the initial *ex parte* hearing on the TRO did not violate any due process rights of OCON. It was necessary in this case to have an immediate hearing on the TRO because of the potential danger in the continuation of harm to the environment and public health and welfare. OCON was afforded a post-deprivation hearing pursuant to the statute within three days of the issuance of the TRO, which was sufficient to prevent any due process violations.

OCON next asserts the hearing on July 17 should have been to determine whether the TRO was wrongfully issued. Section 43(a) of the Act provides that the court "shall schedule a hearing on the matter not later than 3 working days from the date of injunction." (Ill. Rev. Stat. 1991, ch. 111½, par. 1043(a).) What constitutes a hearing "on the matter" is not defined. The trial court believed the hearing was to determine whether the TRO should be continued. The State's complaint sought the hearing to have the court issue a preliminary injunction against OCON.

The purpose of the hearing three days after the issuance of the TRO is to determine whether the TRO needs to be continued and whether the trial court should grant a preliminary injunction. The trial court held the hearing on this basis rather than determining whether the TRO was wrongfully issued. The trial court here never specifically found whether the TRO was wrongfully issued because it instead determined that the issues were moot since OCON had complied with the TRO. At the November 9, 1992, hearing, the trial court

and counsel had extended dialogue as to the procedures to be followed when it is alleged an *ex parte* order is entered wrongfully. As we have stated heretofore, defendant asserted a two-step procedure, first to determine whether the TRO was wrongfully issued, and second, to determine damages. The trial court's assessment of section 11—110 determined that both steps would be in a single petition and because the TRO had been dissolved, any petition alleging its wrongful issuance would present a moot question. We agree with the *Boltz* court, "We believe that the motion to dissolve the injunction should have been heard first ***." *Boltz v. Estate of Bryant* (1988), 175 Ill. App. 3d 1056, 1063, 530 N.E.2d 985, 989.

We dismissed the first appeal of this cause by OCON because there was no final order on the motion to dissolve filed July 17, 1992, nor on the motion to vacate filed August 3, 1992. On November 9, 1992, the trial court heard these motions. At that hearing, the trial court specifically ruled on the defendant's motion to dissolve and vacate the TRO. In the process, the trial court rejected all of the grounds alleged by OCON in its claim that the TRO was wrongfully issued. Thus, the trial court found that the TRO was not wrongfully issued. We agree with the trial court's reasoning on each of those issues. Accordingly, we have no need to reach the question of damages.

In conclusion, we find (1) the issues presented by this appeal are not moot, (2) the provisions of section 11—101 of the Code do not apply to injunctive actions pursuant to section 43(a) of the Act, (3) no due process violations occurred, and (4) the *ex parte* order entered July 15, 1993, was not wrongfully issued.

For the foregoing reasons, therefore, the judgment of the circuit court of Livingston County is affirmed.

Affirmed.

GREEN, J., concurs.

PRESIDING JUSTICE STEIGMANN, specially concurring:

Although I agree with the result reached in the majority opinion and with much of what is said therein, I do not agree that this court need say it. In my judgment, because OCON never filed a petition for damages under section 11—110 of the Code, the trial court did not (and did not have to) address OCON's assertion that

the July 15 TRO had been wrongfully issued; accordingly, this court has nothing to review.

As the majority opinion notes, OCON asserts that proceedings under section 11—110 first require a determination by the trial court whether the TRO was wrongfully issued, and then second, a hearing on damages. Consistent with this assertion, OCON insisted throughout this litigation that it was entitled to a hearing on whether the July 15 TRO was properly issued. The trial court informed OCON that the court did not agree with OCON's two-stage analysis; instead, the court believed OCON needed to file a petition for damages under section 11—110 of the Code, and the court would then conduct a hearing to determine damages, assuming it found liability to exist. I think the trial court's position on this point was correct. At the July 17, 1992, hearing, the trial court stated that the TRO had achieved its purpose (the court noted the train had been moved), and the court was not going to extend the TRO further because the matter had become moot. Thus, the trial court correctly determined there was no need to address OCON's July 17, 1992, motion to dissolve the July 15 TRO.

None of the cases cited by the majority in support of its claim that OCON did not need to file a section 11—110 petition for damages addresses the precise situation presented here: the trial court's determination that a TRO expired *before* the trial court entertains the defendant's motion to dismiss. For example, in *Emerson Electric Co. v. Sherman* (1986), 150 Ill. App. 3d 832, 836, 502 N.E.2d 414, 417, the defendant never filed a motion to dissolve the preliminary injunction before it expired by its own terms, so the court's discussion of what should have happened *if* the defendant had done so is only *dicta*. Furthermore, section 11—110 of the Code is a statutory remedy, and we ought not construe statutes as if the legislature intended to require courts to engage in nugatory acts, such as conducting a hearing on a TRO that has already expired. Instead, we should construe section 11—110 in such circumstances as simply requiring the filing of a petition for damages in order to trigger that section's procedures.

Of more serious concern to me than the above discussion on section 11—110 is the outrageous conduct in this case of the Illinois Attorney General's office, which represented the IEPA. On July 15, 1992, attorneys from that office presented the circuit court of Livingston County with a complaint for the TRO which the court ultimately issued. However, the Attorney General's office never informed counsel for OCON that it was going to seek the Livingston

County TRO even though an assistant Attorney General prepared the petition on July 12, 1992, and on July 14, 1992 (*the day before* appearing in Livingston County), the *same* parties and the *same* lawyers dealt with the *same* issues in the circuit court of St. Clair County. Indeed, the St. Clair County proceeding ultimately resulted in the Fifth District Appellate Court's decision discussed at length in the majority opinion.

Under these facts, the failure of the Attorney General's office to notify counsel for OCON is inexcusable and shocking. Apparently, someone at the Attorney General's office thinks that this conduct amounts to good, lawyer-like "hardball tactics," but I disagree. I deem their conduct sleazy and unprofessional. If the laws of this State and the rules of the Supreme Court of Illinois do not permit sanctions to be imposed for this conduct, then those laws or rules need to be changed.

Further, this case is a good example of why trial judges should *always* inquire of an attorney seeking a TRO what efforts he or she has made to inform the affected party that a TRO will be sought. When, as here, judicial inquiry would reveal not only a preexisting relationship (albeit adversarial), but also that *no notice* had been given despite the opportunity to do so, then the trial court should emphatically deny the petition and tell petitioner's counsel bluntly and directly what the court thinks of such tactics. Trial judges should remember that no petitioner is *entitled* to the issuance of a TRO, even if the petition therefor might be sufficient. The question of whether to issue a TRO is still left to the sound discretion of the trial court.

For years courts throughout this nation have complained about the loss of civility in the practice of law and wondered what they can do to reverse this trend. This case provides a textbook example of the lack of civility we have complained about, and if we judges in Illinois tolerate conduct like this, then we have lost our moral authority to complain.