THE PEOPLE OF THE STATE OF ILLINOIS *et al.*, Plaintiffs-Appellants, v. VAN TRAN ELECTRIC CORPORATION, Defendant-Appellee.

Fifth District   No. 5—86—0302

Opinion filed February 3, 1987.

176

Neil F. Hartigan, Attorney General, of Springfield (Roma Jones Stewart, Solicitor General, of Chicago, and Mark A. LaRose, Assistant Attorney General, of Springfield, of counsel), for appellants.

Gregory H. Wolk and Caroline M.C. Komyati, both of Tockman & Wolk, of St. Louis, Missouri, for appellee.

JUSTICE WELCH delivered the opinion of the court:

Plaintiffs commenced this action in the circuit court of Fayette County for, *inter alia*, a preliminary injunction allowing the Illinois Environmental Protection Agency (IEPA) access to defendant Van Tran's real estate "for the purpose of accomplishing a remedial investigation and feasibility study and removal or remedial action regarding the past release of hazardous substances." After a hearing, the circuit court denied the preliminary injunction. Plaintiffs appeal. There is no cross-appeal.

Steve Parke, defendant's vice-president of purchasing and compliance, testified at the January 1986 hearing as follows: Defendant is a manufacturer and repairer of small power transformers. Defendant's original plant, the one in question, is located on three acres near Vandalia on Town Branch Creek. At its apex the Vandalia plant employed 65 to 70 people on two shifts. Later defendant added plants in Georgia and Texas and moved its main office to Texas. About 30 people now work at the Vandalia plant. Net income after taxes for 1984, the last recorded year preceding this matter, was about $40,000 for the Vandalia plant and $108,000 for all three plants. Defendant's gross sales were less than $6 million for the year.

Defendant uses oil as a coolant in the transformers it manufactures. Some transformers are ultimately used in locations, such as inside buildings, where a petroleum-based oil is not sufficiently resistant to fire. Years ago defendant used askarel, a synthetic oil, in such applications and used less expensive petroleum-based oil where flame resistance was less important. During the mid-1970's Monsanto, the manufacturer of askarel, began circulating warnings regarding the risks of polychlorinated biphenyls (PCBs) in askarel. Defendant

stopped using askarel about 1976 due to the health hazards of PCBs. That action was precipitated in part by a United States Environmental Protection Agency (USEPA) inspection of the Vandalia plant in 1975. During a strike in 1975, the oil in two storage tanks totaling 14,000 gallons was released at the Vandalia facility. According to Parke, PCBs were never stored in those tanks. Material containing PCBs was stored at the Vandalia facility until 1982. Parke acknowledged there were some "hot spots" of PCBs on defendant's property.

IEPA officials attempted to inspect the Vandalia facility in May 1985, but were denied access. When IEPA finally inspected the Vandalia plant in June 1985, its representatives discovered an unlined, bermed pit about 8 feet in diameter. Defendant's employees used the pit for disposal of paint-fouled, spent solvents generated by defendant's spray-painting operations. Defendant's practice was to allow the solvents to evaporate in the pit until the paint waste became semisolid, at which time it was removed from the pit and placed in a container with other trash for removal to a landfill. IEPA officials took samples of the material in the pit and from soil outside the pit. Parke testified that at the June 1985 inspection, defendant's officials denied handling hazardous wastes because they didn't know they had any. Parke admitted there was no USEPA identification number for this waste, no waste analysis reports, and no notification of disposal of these wastes to IEPA. Defendant's main office, unaware of the solvent pit until the June 1985 inspection, ordered the Vandalia plant to cease using the pit immediately and clean it up. Defendant's employees removed the topsoil to a depth of approximately two to three feet. The contaminated soil was stored in five 55-gallon drums kept at the Vandalia plant, and the excavation was backfilled with soil.

IEPA issued an enforcement letter to defendant as a result of the June 1985 inspection. Received at defendant's Texas office, the letter informed defendant of "apparent violations and non-compliance with the Illinois Environmental Protection Act" (the Act) (Ill. Rev. Stat. 1985, ch. 111½, par. 1001 et seq.) and that the matter was referred to IEPA's legal staff for formal enforcement. The letter also stated: "This letter constitues [sic] the notice required by Section 31(d) of the Illinois Environmental Protection Act prior to the filing of a formal complaint. In accordance with Section 31(d), the Agency will provide [defendant] with an opportunity to meet with appropriate Agency officials in an effort to resolve such conflicts which could otherwise lead to the filing of a formal complaint." Attachment A to the enforcement letter set forth 39 "apparent violations" of the Illinois Administrative Code and the Act. The letter concluded: "In addition

to the above, laboratory analysis results on soil and water samples collected from the surface impoundment and other on-site locations indicate that [defendant] is responsible for the release and threat of release of substantial levels of hazardous substances including, but not limited to, [PCBs], lead, toluene and xylene. [Defendant] will, as a result thereof, be expected to retain an independent contractor to perform a comprehensive Remedial Investigation/Feasibility Study [RI/FS] to determine the nature and extent of the problem presented by contamination release and to develop and evaluate appropriate remedial response alternatives. If a pre-enforcement conference is attended pursuant to the attached cover letter, the Agency would be willing to discuss the necessary scope of a Remedial Investigation/Feasibility Study for the site at that time."

Van Tran officials attended the preenforcement conference in July 1985. There, IEPA issued its RI/FS draft to defendant. Parke testified "we had no earthly idea this would come about. We just couldn't believe it, the scope of this project that was involved here because of a pit." In September defendant hired a consulting engineer, Ernest Brix of Baker/TSA, an environmental engineering firm, who testified he had 11 years of experience in environmental and industrial work, including site assessments and closure options. IEPA inspected defendant's facility a second time on October 3, 1985.

On October 26 IEPA issued its notice to defendant of potential liability for release or threat of release of a hazardous substance pursuant to section 4(q) of the Act (Ill. Rev. Stat. 1985, ch. 111½, par. 1004(q)). The section 4(q) notice consisted of a 16-page "notice" and an 18-page copy of the RI/FS. The "notice" portion was in pertinent part as follows: IEPA had determined defendant might be liable to plaintiffs for any costs incurred as a result of any "response action" undertaken as a result of any failure to act in accordance with the "Identified Response Action" set forth in the notice; such costs might include, but might not be limited to, expenditures for investigation, planning, cleanup and enforcement; defendant was encouraged to undertake voluntary cleanup in accordance with the "Identified Response Action"; if defendant undertook voluntary cleanup, IEPA might determine that additional work was necessary; defendant would be required to perform any such additional work; if defendant declined such work, IEPA reserved the right to do the work itself and seek reimbursement for its costs; all work by defendant was subject to IEPA approval; IEPA reserved the right to enter upon the property at all reasonable times for inspection and review; notwithstanding defendant's compliance with the notice, IEPA reserved the

right to take any enforcement action and to seek injunctive relief, monetary penalties, and punitive damages for any violation of law or the notice; IEPA reserved the right to undertake removal or remedial action at any time and to seek reimbursement from defendant; defendant would pay all response and oversight costs upon accounting submitted by IEPA; and upon defendant's failure to comply with the notice, plaintiffs would seek punitive damages equal to at least three times actual costs incurred. The notice also set forth IEPA's findings regarding hazardous substances found in samples taken on or near defendant's property and set forth a schedule of deadline dates for defendant's compliance with the requirements of the notice.

The "RI/FS" set forth 16 basic "tasks." The first eight tasks constituted the remedial investigation and addressed such topics as "Description of Current Situation" and "Community Relations Support." The task "Description of Current Situation" was divided into eight subtasks. Subtask C, "Site Background," was as follows: "Prepare a summary of the site location, pertinent area boundary features, and general site physiography, hydrology, and geology. Define the total area of the site and the general nature of the problem, including pertinent history relative to the use of the site for hazardous waste disposal." Subtask F required preparation of a site map including topographic features accurate to within 0.5 feet horizontal and 0.1 feet vertical. Subtask G required preparation of a surrounding property map. Task 2D, entitled "Community Relations Plan," required a plan for dissemination of information to the public regarding investigation activities and results including "[o]pportunities for comment and input by citizen, community and other groups."

Brix attended a December 16, 1985, meeting between representatives of Van Tran and IEPA. Brix testified regarding that meeting as follows: He explained to IEPA representatives his goal of arriving at a cost-effective RI/FS and that he needed to know which of the tasks listed on IEPA's RI/FS were necessary and what level of effort was required. IEPA officials replied that each of the tasks had to be done and that if defendant's level of effort on any task was deemed unacceptable or if a dispute arose, IEPA would perform that task at defendant's expense plus penalties. Parke testified IEPA officials told him the RI/FS could cost up to $250,000 and that they anticipated seeking damages amounting to three times costs, and this was for the study alone and had nothing to do with actually cleaning up anything. Brix testified he thought it would take about 12 months to complete the RI/FS for the three-acre site.

Brix testified that at the December 1985 meeting he presented a

one-page summary of the results of two soil borings in the pit area to a depth of 8 feet. Brix testified he found traces of PCBs down to the 6- to 8-foot level but not in sufficient concentration to convince him there was contamination at that level. Brix further testified he found three or four areas outside the pit area where borings revealed PCBs 2 feet down. Brix testified he installed four groundwater monitoring wells on the perimeter of the property. Brix testified he encountered water 12 feet below surface and did not know which direction it was flowing. Brix testified his regular hourly fee was $71 and his work to date for defendant would cost about $25,000. According to Brix, counsel for IEPA told him at the meeting that if defendant began the RI/FS tasks voluntarily, no one at IEPA would say anything other than that defendant was performing a voluntary cleanup; otherwise, the public could learn there was PCB contamination on defendant's site "and who knows where else."

Plaintiffs tendered Charles Reeter, an IEPA employee who collected a series of off-site samples pursuant to IEPA's investigation of this case, as an expert in hydrology, groundwater, and groundwater contamination. Plaintiffs' offer was accepted without objection. Reeter testified only wells "upgradient" from the point of contamination would accurately reflect the background quality of the groundwater and only "downgradient" wells would reflect the extent of contamination. Reeter testified in his opinion the samples taken indicated an off-site release of hazardous substances into the environment. Employees of a private laboratory testified that a relatively rare PCB appeared in some of Reeter's off-site samples. Brix testified he found the same PCB in the soil in the pit area.

Defendant never expressly accepted or rejected the RI/FS. Instead, defendant filed its complaint against IEPA in the circuit court of Fayette County in cause No. 85—CH—48. Thereafter plaintiffs commenced the instant action.

Plaintiffs' 44-page complaint in this matter was in five counts. In count I, entitled "State Superfund," plaintiffs alleged that in 1975 about 14,000 gallons of transformer oil containing PCBs were released from storage tanks on defendant's premises and flowed upon the ground; that a drainage ditch on defendant's property which emptied into Town Branch Creek showed a severe contamination of PCBs; that PCB contamination had also been observed in Town Branch Creek; that IEPA had issued notice to defendant of the "identified response action" to be taken by defendant or by the State in the event defendant failed to do so; that defendant failed or refused to take said action; and that IEPA "has determined that it is neces-

sary and appropriate for it to expend funds" pursuant to the Act to accomplish that response action. In this count plaintiffs prayed the circuit court grant preliminary and permanent injunctions permitting IEPA to enter defendant's property to conduct the RI/FS; that defendant be found liable for all costs of removal and remedy including the RI/FS; and that defendant be found liable for punitive damages in the amount of at least three times the costs incurred by plaintiffs. Plaintiffs also sought a fine of $10,000 for each violation of the Act and $1,000 for each day such violations continued. In count II, also entitled "State Superfund," plaintiffs alleged defendant disposed of spent solvents and PCBs in the bermed pit. In this count plaintiffs sought the same relief as in count I. In count III, entitled "Hazardous Waste Violations," plaintiffs alleged defendant violated the Act by disposing of the material in the pit without regard to "closure and financial assurance requirements" and stored the removed material and other waste in violation of hazardous waste disposal facility requirements. In this count plaintiffs prayed the circuit court preliminarily (and later permanently) enjoin defendant from taking further action regarding the pit or the materials removed from it unless in so doing defendant complied with the Act and that the court fine defendant $25,000 per day for each cited violation. In count IV, entitled "Water Pollution Violations," plaintiffs realleged facts concerning the oil spillage and the pit and prayed the court enjoin defendant from further water pollution violations and fine defendant $10,000 per violation and $1,000 per day. In count V, entitled "Air Permit Violations," plaintiffs alleged defendant operated the following air emission sources or air pollution control equipment at the Vandalia facility: two bake ovens used to dry out the core and coils of transformers that are to be reconditioned, a water baffle and dry filter control unit attached to the transformer tank-painting operation, a gas-fired anneal oven utilized for core production, and the two transformer oil storage tanks with a total capacity of 14,000 gallons, all without permit from the IEPA. In this count plaintiffs prayed the court enjoin defendant from further such violations; plaintiffs also sought fines of $10,000 per violation and $1,000 per day. Plaintiffs sought recovery of attorney fees and expert witness fees as to all counts.

The order of the circuit court denying plaintiffs' prayer for preliminary injunctive relief appears in a handwritten record sheet entry which states in part: "This court further directs the parties to proceed to discovery and preparation of the case for a hearing on the merits and so that this may be accomplished this court directs the parties to meet and develop a plan to and allow for testing to deter-

mine what, if any, hazard exists and to provide samples and to submit to the court w/i 120 days a proposed plan or course of action tailored to the existing situation or need and commensurate to conditions found rather than a rigid, convoluted print-out plan having no particular relevance to this case."

The narrow question before this court is whether the circuit court abused its discretion in refusing the requested preliminary injunction. An initial question concerns the appropriate standard of review. Defendant argues what plaintiffs seek is not only a preliminary injunction, but a preliminary mandatory injunction. Plaintiffs' complaint prays for a preliminary injunction, but not a mandatory injunction in so many words. A mandatory injunction is one which commands performance of some positive act. (*John Deere Co. v. Hinrichs* (1962), 36 Ill. App. 2d 255, 269, 183 N.E.2d 309, 316.) Here plaintiffs seek defendant be enjoined to permit IEPA upon its property, *i.e.*, to enjoin defendant from preventing such entry, and to refrain from certain violations of the Act. This matter does not concern a mandatory preliminary injunction. See *Madigan Brothers, Inc. v. Melrose Shopping Center Co.* (1984), 130 Ill. App. 3d 149, 474 N.E.2d 383, a true mandatory-injunction case in which the plaintiff sought to enjoin the defendants to remove snow from a parking lot.

■■ ■ The rules we generally apply to a preliminary injunction are as follows: Our role in reviewing the grant or denial of a preliminary injunction is strictly limited to determining whether the trial court correctly exercised its broad discretionary power. A preliminary injunction is for the purpose of maintaining or preserving the status quo. The issuance of a preliminary injunction is within the sound discretion of the trial court and is to be used cautiously and in cases of great necessity only. The use of a preliminary injunction is applicable only to situations where an extreme emergency exists and irreparable and serious injury result in the absence of an injunction. (*Dixon v. Village of Lombard* (1977), 50 Ill. App. 3d 590, 593, 365 N.E.2d 1131, 1133-34.) An institutional reluctance to undertake the supervision of specific relief, a social bias against interference with private ordering, and a fear of encouraging unscrupulous litigants to institute unfounded actions are all constants that militate against preliminary-injunction relief. It is not the purpose of the preliminary injunction to determine controverted rights or decide the merits of the case. A preliminary injunction is merely provisional in nature, its office being only to preserve the status quo until a final hearing on the merits. A preliminary injunction is not proper where it tends to change the status quo of the parties rather than to preserve it. In order for a pre-

liminary injunction to issue, the party seeking the injunction must carry the burden of persuasion on four issues: (1) that he possesses a clearly ascertained right which needs protection; (2) that he will suffer irreparable harm without the injunction; (3) that there is no adequate remedy at law for his injury; and (4) that he is likely to be successful on the merits of his action. *In re Marriage of Schwartz* (1985), 131 Ill. App. 3d 351, 353-54, 475 N.E.2d 1077, 1079-80.

▪ Plaintiffs argue the usual preliminary-injunction principles do not apply in this case. Pursuant to section 42(e) of the Act, the State's Attorney of the county in which the violation occurred or the Attorney General, may, at the request of the IEPA or on his own motion, institute a civil action for an injunction to restrain violations of the Act. (Ill. Rev. Stat. 1985, ch. 111½, par. 1042(e).) An action for injunctive relief by the State or an agency thereof pursuant to section 42(e) of the Act is not governed by general equitable principles. The plaintiff need only allege and show the defendant's violation of the Act and that the plaintiff has standing to bring the action; there is no necessity to prove irreparable damage or the absence of an adequate remedy at law. No discretion is vested in the court to refuse to issue an injunction to enforce the terms of the Act. *People v. Keeven* (1979), 68 Ill. App. 3d 91, 97, 385 N.E.2d 804, 808.

▪ The latter standard controls the instant case. In *People v. Keeven* (1979), 68 Ill. App. 3d 91, 385 N.E.2d 804, this court reversed the circuit court's denial of injunctive relief based on the plaintiff's showing that the defendants intended to continue generating wastewater in violation of the Act. Here plaintiffs showed defendant's violations of the Act regarding reporting, storage, and disposal of hazardous wastes. Accordingly plaintiffs were entitled to a preliminary injunction enjoining defendant from further violations of the Act.

▪ We also believe plaintiffs were entitled to a preliminary injunction preventing defendant from refusing IEPA entry onto the property. Section 4(d) of the Act states the authority of IEPA as follows: "In accordance with constitutional limitations, the Agency shall have authority to enter at all reasonable times upon any private or public property for the purpose of: (1) Inspecting and investigating to ascertain possible violations of the Act or of regulations thereunder, or of permits or terms or conditions thereof; or (2) In accordance with the provisions of this Act, taking whatever preventive or corrective action, including but not limited to removal or remedial action, that is necessary or appropriate whenever there is a release or a substantial threat of a release of a hazardous substance." (Ill. Rev. Stat. 1985, ch. 111½, par. 1004(d).) IEPA has authority to provide notice to

any person who may be liable pursuant to section 22.2(f) of the Act (Ill. Rev. Stat. 1985, ch. 111½, par. 1022.2(f)) for a release or substantial threat of a release of a hazardous substance. Such notice must include "the identified response action" and an opportunity for such person to perform the response action. (Ill. Rev. Stat. 1985, ch. 111½, par. 1004(q).) Section 22.2(f) of the Act states which persons may be held liable for "all costs of removal or remedial action incurred by the State of Illinois as a result of a release or substantial threat of a release of a hazardous substance." (Ill. Rev. Stat. 1985, ch. 111½, par. 1022.2(f).) The matter of who shall ultimately bear any costs of removal or remedial action was not before the trial court with respect to plaintiffs' prayer for a preliminary injunction and is not before this court now. Pursuant to section 4(d), the IEPA was entitled to an injunction barring defendant from preventing the IEPA access to the property upon a showing of a release or substantial threat of release of a hazardous substance.

■ Defendant argues the evidence presented did not require the trial court to find a release from defendant's property of a hazardous substance. Plaintiffs argue evidence of a release on defendant's property was sufficient under section 4(d) and no release from the property need be shown. We need not decide that question. Reeter testified that in his opinion the off-site samples indicated off-site release of hazardous substances and the depth at which Brix found soil contamination indicated a possibility of groundwater contamination. Defendant offered no contrary opinion and admitted it made no attempt to collect off-site samples. Thus Reeter's testimony was uncontradicted. Testimony regarding PCB contamination deep in the ground in the pit area was evidence of at least a threat of groundwater contamination. We find this evidence sufficient under section 4(d) to establish plaintiffs' entitlement to an injunction to prevent defendant from barring the IEPA from the property.

■ Defendant argues plaintiffs were required to comply with section 43(a) of the Act (Ill. Rev. Stat. 1985, ch. 111½, par. 1043(a)) to obtain a preliminary injunction in this case. However, section 43(a) by its own terms concerns immediate injunctions on *ex parte* proceedings in circumstances of substantial danger to the environment or the health or welfare of persons. Plaintiffs' complaint did not allege such circumstances and did not purport to be pursuant to section 43. Section 43 is not the sole authority for injunctive relief, as demonstrated by section 42 and *People v. Keeven* (1979), 68 Ill. App. 3d 91, 385 N.E.2d 804.

■ Defendant argues no "release" was shown under the instant

facts since "release" as defined in the Act expressly excludes any release which results in exposure to persons solely within a workplace. (Ill. Rev. Stat. 1985, ch. 111½, par. 1003(ww).) We do not believe the legislature intended to exclude the instant situation by so defining "release." To so interpret section 3(ww) would render the "threat of release" provision of section 4(d) of no effect. As we note above, there was no real contradiction of plaintiffs' showing that hazardous substances migrated off defendant's property. Accordingly the instant matter was not confined to a workplace within the meaning of section 3(ww).

■ Finally, defendant argues plaintiffs' request for injunctive relief was moot in light of *Exxon Corp. v. Hunt* (1986), 475 U.S. 355, 89 L. Ed. 2d 364, 106 S. Ct. 1103. In that case the Supreme Court held section 114(c) of the Comprehensive Environmental Response, Compensation, and Liability Act of 1980 (CERCLA) (42 U.S.C.S. sec. 9614(c) (1982)) preempted a New Jersey statute insofar as the latter statute required petrochemical corporations to pay a State "spill tax" to fund cleanups of hazardous materials. Section 114(c) of CERCLA provides that except as provided in that act no person may be required to contribute to any fund the purpose of which is to pay compensation for claims for any costs of response or damages or claims which may be compensated under CERCLA. As we note above, this case as it now stands does not concern whom shall bear the costs of cleanup. CERCLA section 114(c) has no application to this appeal.

For the reasons above stated, we conclude the circuit court of Fayette County abused its discretion in refusing the preliminary injunctive relief sought by plaintiffs. That order is reversed and this cause is remanded to the circuit court for further proceedings.

Reversed and remanded.

KARNS, P.J., and HARRISON, J., concur.