MIDLAND ENTERPRISES, INC., Plaintiff-Appellee and Counterdefendant-Appellee, v. THE CITY OF ELMHURST *et al.*, Defendants (The Department of Transportation, Defendant-Appellant; The People *ex rel.* The Department of Transportation, Division of Water Resources, Counterplaintiff-Appellant; Harold Reskin, Counterdefendant-Appellant).

Second District No. 2—91—0300

Opinion filed December 10, 1993.

Roland W. Burris, Attorney General, of Springfield (Rosalyn B. Kaplan, Solicitor General, and Jerald S. Post, Assistant Attorney General, of Chicago, of counsel), for appellant.

Douglas C. Hancock, of Caluwaert, Panegasser & Hancock, of Elmhurst (John Panegasser, of counsel), for appellees.

PRESIDING JUSTICE INGLIS delivered the opinion of the court:

The Illinois Department of Transportation, Division of Water Resources (DWR), appeals from an order of the circuit court of Du Page County denying statutory injunctive relief. The DWR had sought a mandatory injunction against Midland Enterprises, Inc. (Midland), to remove two berms and a lift station it had constructed adjacent to its properties on the Salt Creek. The issues on appeal are: (1) whether the trial court had jurisdiction to review the permit conditions when the permit was subject to review pursuant to the Administrative Review Law (Review Law) (Ill. Rev. Stat. 1989, ch. 110, par. 3—101 *et seq.*); (2) assuming *arguendo* that the court had jurisdiction to review the permit conditions, whether the court erred in determining that the permit conditions were unreasonable; and (3) whether the court erred in applying standards for general equitable injunctions when refusing to issue a statutory injunction.

The case began in 1967 when Midland built a shopping center on North Avenue between Route 83 and the Salt Creek in Elmhurst, Illinois. Harold Reskin, president of Midland, applied for a permit with the Department of Public Works and Buildings, Division of Waterways, the predecessor of the DWR. Midland sought a permit to "rip rap" the shoreline of the creek and build a berm. "Rip rap" is a sustaining wall of stones made on an embankment to prevent erosion. After resubmitting the application to request permission only to "rip rap" the shoreline, the application was granted and a permit issued. The permit expired on December 31, 1970, and Midland never "rip rapped" the embankment.

Bruce Hershman, Midland's vice-president, testified that a berm existed next to the shopping center when he moved into his offices in 1969. The berm allegedly remained until July 1979 when the DWR issued a report defining the Salt Creek floodplain. The DWR was aware of the shopping center berm at that time. On October 8, 1979, the chief of the Bureau of Resource Management wrote to Reskin ordering him to remove the berm he had constructed without a permit. Reskin responded on November 14, 1979, writing that Midland "brought the berm down to the level to which it existed before."

A letter from a DWR representative to Reskin dated September 17, 1987, states that Midland never supplied a topographic map to the DWR to verify the berm had been removed. The letter also shows that the two parties met in September 1983 and discussed the construction of a ring berm, which was never done. In this letter, the

DWR requests Midland to remove the berm "constructed or raised since July of 1979" and "restore the floodway conveyance and storage capacity that existed on the site in July of 1979." No other evidence exists to show action on the part of the DWR to inspect or seek injunctive relief concerning this berm between November 1979 and September 1987.

In the summer of 1986, Midland began construction of a hotel on land immediately north of its shopping center. Hershman testified that Midland knew it was building in a floodplain but did not know that a permit was needed to build in a floodplain. Midland had obtained the proper construction permits from the City of Elmhurst.

The DWR first became aware of the hotel construction when a staff member drove by the site in the summer of 1987. At that point, the hotel was nearly 70% completed. The DWR informed Midland it needed a permit, and an application was submitted on August 6, 1987. The plans submitted by Midland called for widening the creek west of the hotel, proposed an area of "newly designated floodway" to the east of the hotel to compensate for lost floodway space due to the hotel's construction, and proposed a berm along the widened bank.

After a number of revisions to the proposed plans, the DWR granted a permit for Midland's project. The permit allowed for the widening of the Salt Creek bank west of the hotel and the creation of a new floodway east of the hotel. The permit specifically excluded the construction of the "proposed future grade berm." The approved plans did not include a lift station, a device used to pump water from an elevated area into a waterway. Midland had already constructed one without a permit, of which the DWR was unaware, that was hidden on the property. Another permit condition relevant to the litigation stated:

"(1). Permittee shall, by agreement with an engineering firm experienced in the field of hydraulics and hydrology, prepare a study on the effect of an existing berm located downstream of the permittee's proposed hotel site on the capacity of Salt Creek to store and convey flood flows. If such study, to be completed within 120 days or such longer period as agreed on by the permittee and the Department, finds such capacity to be impaired during any flood event up to and including the 100 year frequency flood event, said berm shall be removed within 90 days by permittee or permittee shall be permitted to pursue alternative corrective measures to remove such impairment. The berm to be studied and possibly removed is an earth berm approximately 3 to 4 feet high and adjacent to the vegetated

Salt Creek embankment running along the northerly and westerly property line of the North and 83 Shopping Center."

Midland constructed the hotel parking lots to comply with the compensatory flood storage and conveyance area needed to compensate for the loss of floodway area due to the hotel. Midland also widened the creek in accordance with the permit. The "Compensatory Flood Storage Covenant," which detailed the compensatory storage area, was recorded by Midland. However, Midland eventually built the hotel berm specifically excluded in the permit. The lift station was placed in the channel in the spring of 1988 when the creek was widened, unbeknownst to the DWR.

The hotel berm is approximately two feet higher than the adjoining curb. The plans permitted by the DWR had the curb height at 671 to 672 feet above sea level, making the hotel berm approximately 673 feet above sea level. Christopher Burke, the engineer hired by Midland pursuant to condition one of the permit, testified that the hotel berm prevents flood waters from reaching the compensatory storage area during a 10-year flood event. In a 10-year flood event, a major flooding that occurs on an average of once every 10 years, the water would rise to between 672 and 673 feet above sea level.

Midland's vice-president, Hershman, testified that he believed a berm existed west of the hotel before the creek-widening project began. In essence, this berm was a continuation of the shopping center berm. He further testified that the new hotel berm is approximately the same elevation of the berm that existed before the creek was widened. However, Hershman conceded that he was informed by the DWR on more than one occasion that the bank of the creek, where it had been widened, was to be no higher than .10 feet above the curb.

Before building the hotel berm, Midland had complied with condition one of the permit and had a hydraulic study done by Burke. Burke's report, issued on January 18, 1988, stated that the DWR's decision to widen the channel was reasonable and correct. Burke also found that the maximum elevation for the shopping center berm was 673 feet above sea level. Burke testified that the shopping center berm extends from the point where the creek was widened to the southwest corner of the shopping center. Burke also testified that the shopping center berm was made of unsuitable silty material and should be made of clay. A 673-foot berm would not protect the shopping center from a 100-year flood event. If the shopping center berm remained at 673 feet, unimproved forest preserve property and five residential properties upstream, four of which no longer have homes,

would have an increased flood elevation of .10 feet during a 10-year flood event.

Burke further testified that the hotel berm prevented flood waters from reaching the designated flood storage area created to compensate for the hotel construction. The lift station also decreased flood storage.

On February 26, 1988, Midland filed a complaint against the City of Elmhurst and the DWR seeking an occupancy permit for the hotel and a determination by the court as to the proper "[e]ast embankment level as described in IDOT Permit #19075, item number 3." Condition three of the permit specially excluded Midland from building a berm west of the hotel site. At the time of this action, the hotel berm had not been constructed.

The court ordered the City of Elmhurst to issue the occupancy permit. The court never determined the proper level for the creek bank adjacent to the hotel. Midland voluntarily dropped this request and subsequently built the hotel berm at its own chosen elevation.

On March 22, 1988, after the DWR had received Burke's report, the DWR ordered Midland to lower the shopping center berm elevation and return it to 670.25 feet above mean sea level. The level would be returned to the height as it existed on plans submitted to the Department of Public Works and Buildings when Reskin applied for a permit to "rip rap" in the late 1960's. On April 29, 1988, the DWR wrote Midland recognizing that a lift station had also been constructed without a permit and ordered that it be removed. Midland failed to comply with either order.

On June 28, 1988, the DWR filed a counterclaim to Midland's action, seeking a mandatory injunction for the removal of the shopping center berm. Within a few months after this counterclaim was filed, Midland also built the hotel berm. On March 29, 1989, the DWR amended its counterclaim to also seek removal of the hotel berm and lift station.

On February 13, 1991, the circuit court denied the DWR's claims for injunctive relief. The trial judge made a specific finding of fact that Midland removed a portion of the shopping center berm when widening the creek. Without reconstructing the removed portion of the shopping center berm, the resulting gap permits flood waters to flow to the shopping center. A timely appeal was filed on March 12, 1991.

The first issue we will address is whether the circuit court had jurisdiction to review the permit conditions when, pursuant to statute, the permit was subject to review pursuant to the Review Law. Thus,

we must decide whether the circuit court had jurisdiction to review the permit when Midland did not first seek administrative review. The DWR contends that the permit issued by it was a "final administrative decision" subject to review under the Review Law, citing section 26c of "An Act in relation to the regulation of the rivers, lakes and streams of the State of Illinois" (Rivers Act) (Ill. Rev. Stat. 1987, ch. 19, par. 75a). Midland contends that the DWR's action in issuing a permit was not an "administrative decision." As such, Midland argues that the Review Law was not the only method available to review the permit conditions.

 Section 3—101 of the Review Law defines an "[a]dministrative decision" as "any decision, order or determination of any administrative agency rendered in a particular case, which affects the legal rights, duties or privileges of parties and which terminates the proceedings before the administrative agency." (Ill. Rev. Stat. 1987, ch. 110, par. 3—101.) Section 3—102 states that in all cases where the Review Law applies, "any other statutory, equitable or common law mode of review of decisions of administrative agencies heretofore available shall not hereafter be employed." (Ill. Rev. Stat. 1987, ch. 110, par. 3—102.) Section 26c of the Rivers Act states that "[a]ll final administrative decisions" of the DWR are subject to judicial review pursuant to the Review Law. Ill. Rev. Stat. 1987, ch. 19, par. 75a.

Pursuant to section 18f of the Rivers Act, the section pertaining to construction in floodplains (Ill. Rev. Stat. 1987, ch. 19, par. 65f), the DWR promulgated Rule 11.1 of the Rules and Regulations, Illinois Department of Transportation, Division of Water Resources, which states:

> "The report of the Department which establishes this flood plain regulation, *and, subsequently, the issuance or denial of flood plain construction permits* by the Department shall be considered final administrative decisions and are subject to judicial review in accordance with the provisions of the Administrative Review Law." (Emphasis added.) 92 Ill. Adm. Code §706.1110 (1991) (filed on February 18, 1975, and amended on November 27, 1978, and July 21, 1979).

The DWR claims that Midland failed to seek administrative review of the permit within the required 35-day period after the permit was issued. (See Ill. Rev. Stat. 1987, ch. 110, par. 3—103.) Midland waited nearly four months until it sought judicial action pertaining to the embankment west of the hotel. The DWR cites *Fredman Brothers Furniture Co. v. Department of Revenue* (1985), 109 Ill. 2d 202, 211,

as authority that the 35-day period in the Review Law is a jurisdictional limitation.

Midland argues that the issuance of the permit was not a final administrative decision. Midland cites *Lenard v. Board of Education of Fairfield School District No. 112* (1975), 26 Ill. App. 3d 188, and *People ex rel. Vestuto v. O'Connor* (1953), 351 Ill. App. 539, for the proposition that there can be no administrative decision without a hearing. These cases are distinguishable on their facts. In *Lenard,* a teacher was informed by the Board of Education that her employment was being terminated. The Review Law was not the proper source for review of the Board's decision because there had been no proceeding before an administrative agency. In *O'Connor,* a probationary police officer was discharged by the police commissioner. Because the police commissioner did not have the power under law to make administrative decisions, a *mandamus* suit for reinstatement was not barred by the Review Law.

■ Here, the DWR has the statutory power to make administrative decisions to designate floodplains and issue permits under section 18f of the Rivers Act. Rule 11.1 of the DWR rules and regulations specifically states that the Review Law is the vehicle used to seek review of permits. Also, section 26c of the Rivers Act reiterates that final decisions of the DWR are subject to review pursuant to the Review Law. We believe that it cannot be any clearer in the statutory language that the Review Law is the applicable avenue for review.

Midland further contends that it was not required to exhaust its administrative remedies by using the Review Law before seeking independent judicial action. Midland argues that the exhaustion of administrative remedies is not a jurisdictional requirement, but a judicial policy within the court's discretion, citing *Peoples Energy Corp. v. Illinois Commerce Comm'n* (1986), 142 Ill. App. 3d 917, and *First National Bank & Trust Co. v. City of Rockford* (1977), 47 Ill. App. 3d 131. Midland also cites numerous appellate court cases as authority that requiring exhaustion of administrative remedies in this case would result in irreparable harm, onerous delay, and would allow the DWR to use the judiciary to enforce unlawful permit conditions.

■ "The doctrine of exhaustion of administrative remedies applies where a claim is cognizable in the first instance by an administrative agency alone." (*Peoples Energy Corp. v. Illinois Commerce Comm'n* (1986), 142 Ill. App. 3d 917, 931.) Exceptions to the exhaustion requirement are found where a statute is attacked as unconstitutional on its face or where the agency's authority or jurisdiction is challenged. (*County of Kane v. Carlson* (1987), 116 Ill. 2d 186, 199.)

Exhaustion of administrative remedies is not required where administrative review would be futile or where irreparable harm would be caused from a delay to pursue administrative remedies. *Schlenz v. Castle* (1985), 132 Ill. App. 3d 993, 1004, *aff'd* (1986), 115 Ill. 2d 135.

◼ We believe that the exceptions to the exhaustion requirement do not exist here. Midland has not attacked the DWR's authority or jurisdiction. Midland's attack on the permit conditions was not an attack on the constitutionality of the Rivers Act. Seeking review under the Review Law would not have been futile and would not have caused irreparable harm or onerous delay. Midland was required to exhaust its administrative remedies by seeking review of the permit under the Review Law.

Midland relies on *County of Lake v. MacNeal* (1962), 24 Ill. 2d 253, as authority that exhaustion of administrative remedies does not prevent the assertion of a defense ordinarily subject to exhaustion. In *MacNeal,* a property owner challenged a zoning ordinance. The rule that a property owner must seek local relief from a zoning ordinance before going to court is a judicial policy rather than a legislative rule. (24 Ill. 2d at 259.) Unlike *MacNeal,* the rule in the case at bar requiring review of permits through the Review Law is not a judicial policy, but is an administrative rule promulgated with legislative authority. Further, Midland was not simply defending an action brought by the DWR. Midland was the first party to use the courts to seek a determination of the proper level of the embankment west of the hotel. Midland realized independently that the permit condition was adverse to its goals, but sought review in circumvention of the Rivers Act.

We find that the trial court lacked jurisdiction to review the permit conditions because Midland failed to seek review pursuant to the Review Law within the designated 35-day period. To hold otherwise would result in usurping the DWR's administrative authority. The issuance of permits would be a futile exercise if the party receiving the permit could ignore the conditions and proceed as it wished. In every case, the DWR would have to bring an injunctive action to enforce its permits. Based on this court's holding, the DWR's decisions would be subject to review only by following the designated statutory and administrative channels.

◼ Having determined that the permit was not subject to review by the trial court, we need not address Midland's second issue on appeal concerning the trial court's finding that the permit conditions were unreasonable. However, our disposition of the first issue only precludes review of the permit conditions challenged by Midland: (1) the condition prohibiting the building of the hotel berm; and (2) the

requirement to have a hydraulic study performed. The condition requiring the hydraulic study did not automatically require removal of the shopping center berm. If the permit is to be considered a "final" decision, the subsequent determination by the DWR that the shopping center berm impairs flood capacity must be a separate decision. Otherwise, there is no guarantee that this issue could be subject to review. The hydraulic study most likely would not be completed within the 35-day period in which Midland was to seek review of the permit.

Midland had 35 days in which to review the affirmative duties placed on it by the permit—to refrain from building the hotel berm and to have the hydraulic study done. Because Midland failed to seek review properly, the trial court did not have jurisdiction to review the permit conditions. We hold that the portion of the trial court's order denying the DWR injunctive relief as to the hotel berm be reversed.

We will address the DWR's third issue, whether standards for general equitable injunctions should be used in refusing to issue a statutory injunction, only as it relates to the lift station and the shopping center berm. The DWR does not claim that its decision on March 22, 1988, to lower the shopping center berm was an "administrative decision" subject to the Review Law. As such, we will not address that issue. Our holding on the first issue only extends to finding that a permit issued by the DWR is a final administrative decision subject to review under the Review Law.

■ Section 18f of the Rivers Act states, in pertinent part:

"All construction undertaken on a defined flood plain subsequent to the effective date of this amendatory Act, without benefit of a permit from the Department of Transportation, shall be unlawful and the Department, may in its discretion, proceed to obtain injunctive relief for abatement or removal of such unlawful construction." (Ill. Rev. Stat. 1987, ch. 19, par. 65f.)

Midland never obtained a permit to construct the shopping center berm or the lift station placed in the widened embankment sometime in the spring of 1988. The DWR contends that injunctive relief expressly authorized by statute need not satisfy the traditional elements necessary to obtain an injunction, citing, among other cases, *Business & Professional People for the Public Interest v. Illinois Commerce Comm'n* (1988), 171 Ill. App. 3d 948. The court in *People v. Van Tran Electric Corp.* (1987), 152 Ill. App. 3d 175, stated, in a similar situation arising under the Environmental Protection Act (Ill. Rev. Stat. 1985, ch. 111½, par. 1042(e)):

"An action for injunctive relief by the State or an agency thereof pursuant to section 42(e) of the Act is not governed by general equitable principles. The plaintiff need only allege and show the defendant's violation of the Act and that the plaintiff has standing to bring the action; there is no necessity to prove irreparable damage or the absence of an adequate remedy at law. No discretion is vested in the court to refuse to issue an injunction to enforce the terms of the Act." *Van Tran*, 152 Ill. App. 3d at 184.

Midland argues that the DWR did not request injunctive relief based on the statute, but sought the relief based on the permit conditions only. Midland further claims that there is no statutory provision enabling the DWR to compel performance of the permit conditions, thereby necessitating that equitable principles be considered. Midland also argues that *People ex rel. Baise v. Harris* (1988), 177 Ill. App. 3d 1027, a case relied upon by the DWR as authority that mandatory injunctions may be issued to remove unpermitted culverts placed in streams, is distinguishable on its facts. Finally, Midland cites a New York case as authority that mandatory injunctions are generally not granted solely upon the failure to obtain a permit.

■ The general rule that a statutory claim need not satisfy the traditional principles of equity is based upon the presumption that public harm occurs when the statute is violated. (*People ex rel. Hartigan v. Stianos* (1985), 131 Ill. App. 3d 575, 580.) The State or agency need only show that the statute was violated and that the statute relied upon specifically allows injunctive relief. *Sadat v. American Motors Corp.* (1984), 104 Ill. 2d 105, 110-12.

■ Midland's assertion that the DWR was not seeking injunctive relief pursuant to a statute is unpersuasive. The entire process of issuing permits is based on the Rivers Act, in this particular case, section 18f of the Rivers Act. We agree with the trial court that the DWR cannot claim violations of section 18g of the Rivers Act, the section concerning floodways, because that *section* of the Rivers Act was not effective until two weeks *after* the permit was issued to Midland on November 4, 1987. However, the DWR's permit was issued pursuant to the preexisting section 18f of the Act. The DWR was relying on its authority in section 18f to seek injunctive relief for unlawful construction in a floodplain.

Further, Midland's claim that no statute exists enabling the DWR to require that the permit conditions be performed is also without merit. Midland claims that the DWR is seeking to compel that the permit conditions be performed, but it can equally be said that DWR

was seeking to enjoin unlawful construction. The DWR has statutory authority to enjoin unlawful construction pursuant to section 18f of the Rivers Act.

The *Harris* case cited by the DWR was a case in which the Department of Transportation was granted a mandatory injunction to remove a stream enclosure constructed without a permit. Midland seeks to distinguish this case by the fact that the landowner never completed an application for a permit and the enclosure would cause damage to nearby property that would not occur here, an equitable consideration. However, the only question in *Harris* was whether the defendant's situation came within the scope of the statute. The court engaged in statutory construction, not an analysis of general equitable principles. *Harris*, 177 Ill. App. 3d at 1032-33.

Finally, Midland cites *Finger Lakes Health Systems Agency v. St. Joseph's Hospital* (1981), 81 A.D.2d 403, 442 N.Y.S. 219, for the proposition that statutory injunctions are not generally granted solely for failing to obtain a permit. In fact, the court in *Finger Lakes* refused to issue an injunction because there was no demonstrated public harm from the statutory violation. In the appeal at bar, there is a presumption that public harm occurs when a statute is violated. (*Stianos*, 131 Ill. App. 3d at 580.) The evidence shows that the existence of the berm increases flood waters upstream. This fact makes *Finger Lakes* distinguishable, and, also, *Finger Lakes* lacks precedential value in the Illinois courts.

We find that the trial court erred in applying general equitable principles in refusing to issue a statutory injunction. Thus, we reverse the trial court's decision not to enjoin the construction of the lift station. However, the issue concerning the removal of the shopping center berm calls for additional analysis. We may affirm the order of the trial court, or a part thereof, for reasons other than those stated by the trial court. *Estate of Johnson v. Condell Memorial Hospital* (1988), 119 Ill. 2d 496, 502.

We believe that it would be unjust to require Midland to remove the shopping center berm that has existed at least since 1979 and possibly as far back as the late 1960's. Between the time the shopping center berm was constructed and the time the hotel project began, the DWR was not diligent in requiring Midland to remove the unlawful construction. A few inquiries were made by the DWR, but the record reflects that it never followed through with an inspection of the site or a timely action to enjoin the construction. Also, the situation has changed in the area surrounding the shopping center. In the mid-1980's, the elevations of the roads adjacent to the shopping center and the North Avenue bridge were raised. The shopping center property has become more flood prone than it was when the berm was first built. Requiring Midland to remove the berm could be disastrous for the

shopping center, even in flood events less extreme than a 10-year flood event.

Under the doctrine of *laches*, equitable relief such as a mandatory injunction will not be granted where the failure to assert the right, coupled with a lapse of time and changed circumstances, would cause prejudice to an adverse party. (*Finley v. Finley* (1980), 81 Ill. 2d 317, 329.) The doctrine of *laches* is ordinarily not applied to the State (*Pavlakos v. Department of Labor* (1985), 111 Ill. 2d 257, 265), but may be in extraordinary circumstances (*Haeflinger v. City of Wood Dale* (1984), 129 Ill. App. 3d 674, 679).

Based on the facts stated above, we believe this is a proper case in which *laches* may be applied against the State. We hold that the portion of the shopping center berm that remains may not be enjoined and the trial judge's ruling concerning the shopping center berm will stand. We recognize that the trial court found that flood waters will flow down to the shopping center because a portion of the old berm was removed to widen the creek. However, Midland had to make the appropriate changes to compensate for the addition of the hotel by widening the creek west of the hotel and creating the new floodway storage east of the hotel. These changes necessitated the removal of a portion of the berm that, according to Midland officials, existed before the creek was widened. If the water rising above the curb west of the hotel fails to flow into the newly designated floodway, Midland may seek a permit to regrade the area or come up with another *permitted* solution to prevent water from reaching the shopping center.

For the foregoing reasons, we affirm the trial court's denial of a mandatory injunction as it pertains to the remaining shopping center berm and reverse the order as it pertains to the hotel berm and lift station and remand to the Eighteenth Judicial Circuit Court, Du Page County, Illinois, to order Midland Enterprises, Inc., and Harold Reskin, its president, to immediately remove the berm and lift station constructed along the Salt Creek adjacent to the Comfort Inn motel at Route 83 and North Avenue in Elmhurst, Illinois, and to return the elevation of that bank to the level specified on the permit issued to Midland Enterprises by the Department of Transportation, Division of Water Resources.

Affirmed in part; reversed in part and remanded.

GEIGER and QUETSCH, JJ., concur.